No. 44,964

THE STATE OF KANSAS, *Appellee,* v. ALFRED G. JONES, *Appellant.*

(446 P. 2d 851)

Opinion filed November 9, 1968.

*G. Edmond Hayes,* of Wichita, argued the cause and was on the brief for appellant.

*Keith Sanborn,* County Attorney, argued the cause, and *Robert Londerholm,* Attorney General, *James Z. Hernandez,* Deputy County Attorney, and *David P. Calvert,* Deputy County Attorney, were with him on the brief for appellee.

The opinion of the court was delivered by

FATZER, J.: The defendant, Alfred G. Jones, was charged in one and the same information with eight separate and distinct crimes relating to his unlawful possesion and use of pistols.

The first count charged the possession and control July 18, 1966, of a .357 magnum revolver after conviction of the offense of attempted armed robbery in the state of California in June 1965, in violation of K. S. A. 21-2611. The second count charged the willful resistance and opposition of a ministerial officer on July 18, 1966, in the discharge of an official duty in a felony case, in violation of K. S. A. 21-717. The third count charged an assault upon Charles Stewart, a Wichita police officer, on July 18, 1966, with a .357 magnum revolver, in violation of K. S. A. 21-431. The fourth count charged the possession and control on July 16, 1966, of a .32 caliber revolver after conviction of the offense of attempted armed robbery in the state of California in June, 1965, in violation of K. S. A. 21-2611. The fifth count charged robbery in the first degree on July 16, 1966, of $3,946 lawful money of the United States from the Steen's Super Discount Store in the presence of and against the will of John W. Marshall, in violation of K. S. A. 21-527. The sixth

count charged the deliberate and premeditated murder of John W. Marshall on July 16, 1966, with a .32 caliber revolver in violation of K. S. A. 21-401. The seventh count charged the deliberate and premeditated murder of Sue M. Marshall on July 16, 1966, with a .32 caliber revolver in violation of K. S. A. 21-401. The eighth count charged the possession and control on June 5, 1966, of a .22 caliber short Rahm revolver after conviction of the offense of attempted armed robbery in the state of California in June, 1965, in violation of K. S. A. 21-2611.

At a trial in the district court by a jury, which commenced on January 3, 1967, and terminated on January 16, 1967, the state's evidence was the only evidence introduced. Although the defendant issued subpoenas for witnesses to testify on his behalf, he called no witnesses and offered no evidence. At the close of the state's evidence and the overruling of the defendant's motion for discharge, the case was submitted to the jury. The defendant was found guilty of each of the separate crimes charged in the information, and for conviction of each of the crimes of murder the jury assessed the penalty of confinement at hard labor in the Kansas State Penitentiary for life. Upon the overruling of his motion for a new trial on February 3, 1967, the defendant was duly sentenced to the penalties prescribed by the statutes, all of the sentences to run consecutively with each other, and he timely perfected this appeal.

The events giving rise to this appeal took place in Wichita in June and July of 1966.

Highly summarized, the evidence disclosed that between the hours of 10:30 p. m. on Saturday, July 16, and 3:45 a. m. on Sunday, July 17, Steen's Discount Store at 21st and Grove Streets in Wichita was robbed of $3,946, and Sue M. Marshall and her husband, John Marshall, an employee of the store, were shot and killed with a .32 caliber revolver. About 3:40 a. m. on July 17, a merchant police officer tried the front doors at Steen's Store. One of them was unlocked. The outside doors of the store were locked at approximately 10:35 p. m. when all the employees left the store except John and Sue Marshall who were checking the day's receipts at the courtesy counter. The police were notified and the robbery and homicides were discovered. A witness who was leaving a friend's house and returning home passed the east end of the store at approximately 10:35 p. m. and heard three loud noises—like somebody beating

on a pot or a pan. Upon learning of the deaths of the Marshalls the next morning, the witness remembered those sounds and reported to the police he heard three shots, thus establishing the approximate time the Marshalls were killed and the robbery occurred.

The defendant lived with two other men at 2508 Stadium Street in Wichita. He also had a bed in the basement of his parents' home at 2208 Shadybrook in Wichita, where he occasionally slept. The Stadium address was within three blocks or two minutes thirty seconds walking distance, and less than one and a half minutes running time from Steen's store. When arrested on Monday, July 18, the defendant was at the Stadium address.

It was the theory of the state that the defendant entered Steen's store and hid until all the employees left except the Marshalls; that he then approached the Marshalls and forced them into the meat department where he killed John Marshall and killed Sue Marshall in the insulated meat cooler where she was trying to hide, and that he then robbed the store of $3,946. The defendant was seen to enter the store about 7:30 p. m. and was never seen to leave. His appearance was one of easy identification. Several months prior to July 16, the defendant was in an automobile accident which crushed his lips and broke his jaw in seven or eight places. Because of damaged facial muscles, his features pulled over in a sneer, twisting his eyes and other physiognomy in a cruel appearing position. There was a resulting loss of control of his saliva gland necesitating the frequent use of a handkerchief or towel to his mouth.

There were four shots fired when the Marshalls were killed. One bullet went through the front window of the store, two bullets were fired into the head of John Marshall, and one bullet into the head of Sue Marshall. The jury could reasonably conclude that the testimony of the witness that he heard only three shots was because the fourth shot fired into the head of Sue Marshall was muffled by the insulation of the meat cooler.

The evidence of the ballistic expert of the Wichita police department was uncontroverted that the bullets removed from the heads of John and Sue Marshall were fired by the defendant's .32 caliber pistol. Likewise, the evidence was uncontroverted that five expended .32 cartridges found in the waste basket in the bathroom at the Stadium address were fired from the defendant's .32 caliber pistol. The ballistic expert further testified that small flecks of gray

paint found on the barrel of the defendant's .32 caliber pistol matched all the physical characteristics of the gray paint on the meat counter in Steen's store where John Marshall was murdered, and further there were some identifiable indentations in the wood of the meat counter.

The activities of the defendant as established by the evidence were as follows: On Friday, July 15, one Carolyn Bills, the defendant's girl friend, was treated at a hospital after she accidentally shot herself with the defendant's .32 caliber pistol while trying to unload it at the Stadium address. The defendant accompanied her to the hospital and told her to state the pistol was hers. This was untrue, and Miss Bills later telephoned the police the serial number showing the pistol was purchased by the defendant on July 9, at the Wichita Brokerage Company, in his brother's name. The evidence showed the pistol was in the defendant's possession at 4:30 p. m. Saturday, July 16.

On Saturday night, July 16, Clara Hopson and her husband drove to the Stadium address to see what the defendant and Ralph Credit, who lived with him, were doing. The defendant was a cousin of Clara's husband and Credit was her brother. She testified "it was around 11:20, between 11 and 11:30." The Hopsons drove the defendant over to his parents' home at 2208 Shadybrook where he went into the house with a brown paper sack "like you get at the store," containing something. The Hopsons were visiting in the street with the defendant's brother and as they were preparing to leave, the defendant came back without the paper sack and asked them to drive him down on Murdock Street. The evidence showed that thereafter the defendant went "out on the town" for the balance of Saturday night, displaying a large sum of money.

On Sunday morning, July 17, the defendant gave one of his friends some money at the Stadium address to make a delinquent car payment and he complained to another friend that Ralph Credit had taken $500 of his money. After Credit fell asleep the defendant took Credit's billfold and showed the witness he had $480 in twenty-dollar bills which he said Credit had taken.

The defendant's activities disclosed that all day Sunday he engaged in a series of crap games where he lost large sums of money, the losses of which were established by the testimony of the witnesses who won the money. As the word spread that the defendant had a large sum of money, the games referred to were set up by

professional gamblers for the purpose of separating the defendant from his money.

On Monday morning, July 18, the defendant returned to his parents' home at 2208 Shadybrook just as his brother was leaving to teach school. The defendant gave approximately $700 in cash to his brother's wife to keep for him. Later that day the defendant and his cousin went to Rosen Brothers Pawn Shop where he purchased a .357 magnum pistol and ammunition which cost in excess of $100. Instead of giving his own name when he purchased the gun, he gave and signed the name of his brother, A. J. Jones, as being the owner. The defendant immediately loaded the gun, and he appeared nervous. On the way back to the Stadium address the defendant told his cousin that on Sunday he lost $1600 gambling. The amount of money expended by the defendant and his crap game losses and the delivery of money for safekeeping accounted for the bulk of the money taken in the robbery.

On Monday, July 18, armed with the evidence of the robbery and the murders, the defendant suddenly having large sums of money, his background, his status and certain statements made by him with respect to having shot those "M . . . F . . .'s in the head," Captain Hannon of the Wichita police department filed his verified applications with Judge Noone of the district court for two search warrants, one for the Stadium address and one for the Shadybrook address. The search warrants were issued by Judge Noone upon probable cause at 3:05 p. m.

When the officers went to the Shadybrook address they were invited into the house. After they explained their mission, the defendant's brother went to his and his wife's bedroom and came out with a large sack of bills which he and his wife and a detective initialed. This was the money the defendant had given to his sister-in-law to keep. There was one ten-dollar bill, 114 five-dollar bills, and 131 one-dollar bills. A search was made of the defendant's bed in the basement of the house and the detective discovered two one-dollar bills and one five-dollar bill hidden under his mattress. All the money was turned over to the officers at about 5:00 p. m. No search was made of the premises outside the house.

Detective Stewart had the search warrant for the Stadium address and, together with other officers, went to that location to execute the warrant and search the premises. He did not know the defendant, and went to the address in connection with the investiga-

tion of the murder of the Marshalls in the course of the robbery of Steen's store. Circumstances known to him and the other police officers were such as would warrant a reasonable cautious man in the belief that the defendant had committed the murders, and if they would see and identify him, they would arrest him for murder. As Stewart approached the house he walked up to the front stoop and knocked on the screen door. He identified himself as a police officer, saying "Police Officer, I'd like to talk with you." There was a couch along the wall immediately inside the door. The door was on the south side of the house and the couch ran north and south against the east wall of the living room. The defendant was lying on the couch on his back with his head toward the door. When Stewart identified himself and knocked on the screen door, the defendant rolled over and reached for his loaded .357 magnum pistol which was lying on the floor by the couch. He got his hand on the weapon and Stewart, seeing his action and seeing the weapon, opened the screen door, sprang into the house and kicked the gun away from the defendant's hand to keep the defendant from shooting him. After the defendant identified himself, Stewart placed him under arrest for murder and handcuffed him. The defendant's person was searched and cartridges for the .357 magnum pistol and some $31 in currency were found in his pockets which were removed following his arrest.

The house and yard at the Stadium address were searched by the officers. A .32 caliber cartridge was found near the front steps and another was found in the northwest corner of the living room. Three .357 magnum cartridges were found on the couch where the defendant had been lying, and a box containing twenty-one .357 magnum cartridges was found in the bathroom. There were two bullet holes between the window and the fireplace and a third bullet hole leading outside beneath the lower east window sill. As previously indicated, five .32 caliber expended cartridges were found in the wastebasket in the bathroom; one was found in the hallway, and another on the floor of the bathroom.

Upon completion of the search, the defendant was taken into custody and held for the issuance of a warrant. The following day, Tuesday, July 19, a complaint was filed in the Court of Common Pleas of Sedgwick County charging the defendant with seven separate felonies, and a warrant was issued for his arrest. He was taken before a magistrate where he appeared with Mr. Russell

Shultz, an experienced criminal lawyer, who had been retained by him.

On Wednesday, July 20, a second search warrant was issued for the Shadybrook premises upon the application of Captain Hannon. The application was made to Judge Noone of the district court, who issued the search warrant upon probable cause at 5:15 p. m. A search of the Shadybrook premises was made by police officers who found the defendant's .32 caliber pistol in the yard lying in the grass between an old car and the hedge growing on the property line. The car was parked off the driveway near the hedge. It had a flat tire and the grass beneath it was dead, indicating it had not been driven for some time. The lawn was Bermuda grass and there were runs of grass over the weapon. The grass beneath the weapon was a dark yellow. There was an area between the dark yellow and green grass which was a lighter shade of yellow. Near the weapon and immediately west and beneath the hedge was a neatly folded white handkerchief with a monogram of "J" on top of it. A single dollar bill was found immediately south of the right front wheel of the car.

The gun was photographed where it lay in the grass and it was removed to the laboratory for examination and a comparison was made between the bullets from the heads of the Marshalls and the pistol. The gun had six chambers in the cylinder, which contained two cartridges in adjacent chambers. The other four chambers of the cylinder were empty. The weapon had been fired four times. Tests conducted in the growing of the same type of grass were completed on December 31, 1966, and were used to establish the number of days the pistol had been lying in that location.

On August 23, an amended complaint was filed charging the defendant with the commission of the eighth felony—the unlawful possession and control on June 5, of a .22 caliber short Rohm revolver after conviction of a felony in the state of California. The evidence in support of this offense established that on June 5, Carolyn Bills, the defendant's girl friend, broke up with the defendant and while he was chasing her down the street she fell; he caught up with her and was holding the .22 caliber pistol to her head when her uncle, Robert Holliman, Jr., interfered and knocked the pistol away. The defendant then turned on Holliman and attacked him, which gave Miss Bills time to run away. A neighbor boy saw the defendant throw the gun in the alley. The loaded .22

pistol was recovered from where it had been thrown. Miss Bills was the witness the defendant attempted to prevent from testifying at the trial on the grounds she was his common-law wife. The evidence further established that the defendant purchased the .22 caliber pistol from Wichita Brokerage Company on May 8, 1966.

On September 9, the defendant was given a preliminary examination. The defendant appeared in person and with his retained counsel. The state presented its evidence at the conclusion of which the judge of the Court of Common Pleas of Sedgwick County found that each of the eight offenses alleged against the defendant had been committed and that there was probable cause to believe the defendant committed the felonies charged, and he was bound over to the district court to stand trial in the Septempter 1966 term of the court.

On September 14, the county attorney filed a verified information in the district court charging the defendant with the eight separate felonies heretofore referred to, and endorsed thereon the names of all witnesses known at that time to the county attorney.

On September 19, the defendant and his retained counsel appeared before the district court for arraignment where the defendant stood mute with respect to all charges alleged against him. The district court entered a plea of not guilty on all counts (K. S. A. 62-1305), and the case was set or trial by a jury on October 19, at 9:00 o'clock a. m. The question of serving a copy of the information upon counsel for the defendant pursuant to K. S. A. 62-1302 was raised by the district court on its own motion, and was settled to the satisfaction of the defendant, his counsel, and the court, at the arraignment.

In the meantime the defendant was unable to make financial arrangements with Mr. Shultz, and he was permitted by the district court to withdraw as counsel for the defendant. On or about October 17, the defendant retained Mr. G. Edmond Hayes who tried the case on his behalf and represented the defendant on this appeal.

On October 17, the counsel for the defendant filed a motion for the continuance of the trial over the September term, which was sustained, and the trial was continued generally. Other pretrial motions were lodged and heard covering more than 400 pages of transcript. The case was set for trial on January 3, 1967, and the defendant lodged several more motions the day of the trial. Those were overruled, the jury was selected, about which no complaint is

made, and at the close of the evidence and arguments of counsel, the jury returned a verdict of guilty on all counts charged as heretofore indicated.

The argument in the briefs and before this court took a very wide range involving twenty some specifications of error on the part of the appellant, which were all denied by the state.

It is first contended the district court erred in overruling the defendant's plea in abatement filed November 7, 1966. The defendant attempts to raise the validity of the issuance of the warrant for his arrest by the clerk of the court of common pleas. He maintains that such an officer is not empowered to determine probable cause, and argues such a determination is a judicial act which cannot be delegated to a ministerial officer. The state of the record does not require we decide the point. Pleas in abatement are dilatory pleas and are not favored by the courts. (*Walker v. United States*, 93 F. 2d 383, cert. den. 303 U. S. 644, 82 L. Ed. 1103, 58 S. Ct. 642, reh. den. 303 U. S. 668, 82 L. Ed. 1124, 58 S. Ct. 755.) Courts have been and are particular about the sufficiency and promptness of the filing of such pleas. The general rule is set forth in 22 C. J. S., Criminal Law, § 429, p. 1224, as follows:

"A plea in abatement must be presented with the greatest promptness, usually not later than the arraignment, and ordinarily must precede an application for a . . . continuance . . . and if not filed in proper time is regarded as waived."

The defendant was arraigned September 19, and a plea of not guilty was entered for him. Thereafter, and on October 17, he filed a motion for continuance and the facts presented in his plea in abatement filed November 17, were known to him at the time he sought the continuance. Under such circumstances the right to plead in abatement was waived. (*State v. Tucker*, 115 Kan. 203, 222 Pac. 96; *State v. Bland*, 120 Kan. 754, 755, 244 Pac. 860; *State v. McCarther*, 196 Kan. 665, 414 P. 2d 59.) See, also, *State v. Pittman*, 199 Kan. 591, 433 P. 2d 550, and *Gray v. State*, 194 Tenn. 234, 250 S. W. 2d 86. Moreover, the defendant was arrested by the officers on July 18, at the Stadium address on probable cause for the crimes of murder. In addition, the defendant was afforded a preliminary examination where the state presented evidence upon which the examining magistrate made a finding that the crimes charged had been committed and that there was probable cause to believe that the defendant committed them. The entire question was moot at the time the plea in abatement was filed.

It is next claimed the district court erred in overruling the defendant's motion to require the state to endorse on the information the names of additional witnesses within a reasonable time before trial, and, further, that it erred in permitting the state to endorse eight additional witnesses on December 30.

K. S. A. 62-802 requires the county attorney to endorse the names of the witnesses known to him at the time of the filing of the information, and to endorse the names of such other witnesses as may afterwards become known to him, at such times before the trial as the court may by rule or otherwise prescribe.

The defendant filed a motion making several requests of the court in numbered paragraphs. The fourth paragraph requested the court to set a date for the state to have endorsed on the information all the witnesses it intended to use. On December 15, the district court denied the motion upon the grounds that it was premature and that it called for an assumption there would be additional witnesses endorsed without the court knowing who they might be and what they would testify to. The court stated a ruling upon the question would be made upon the facts and circumstances if and when the question arose.

On December 30, the state filed its motion to endorse the names of eight witnesses on the information, five of whom were listed as residing in California and three of whom resided in Wichita. The out of state witnesses endorsed were not used. However, they were known to the defendant since they were the investigating officers in the charge of attempted armed robbery in California to which he had pleaded guilty, and from which he was on probation to his parents in Wichita. The three Wichita witnesses were experts in the field of botany and chemistry and were used by the state in the experimental control test which was conducted to measure and observe discoloration in grass similar to the discoloration observed when the murder weapon was discovered on July 20, at the Shadybrook address. That test was not completed until on or about December 30, and as soon as it was completed, the names of the expert witnesses were promptly endorsed. The nature of their proposed testimony was disclosed to the defendant, and his counsel had some two weeks to interview the witnesses and prepare for their cross-examination. The record does not support the defendant's assertion of lack of availability of knowledge as to the results of the test. On the contrary, the record discloses that counsel

conducted a protracted cross-examination of the witnesses which disclosed in and of itself a thorough knowledge and preparation of the subject involved.

The defendant directs our attention to *State v. McDonald,* 57 Kan. 537, 46 Pac. 966, but it is not helpful to him. It illustrates the rule that where the state moves to endorse witnesses during the course of trial, the defendant is entitled to a continuance to have an opportunity to interview the witnesses. Here no continuance was requested and it cannot be held that the substantial rights of the defendant were prejudicially affected by the ruling of the district court in permitting the state to endorse the names of the witnesses. In *State v. Poulos,* 196 Kan. 287, 411 P. 2d 689, cert. den. 385 U. S. 827, 17 L. Ed. 2d 64, 87 S. Ct. 63, it was held:

"Whether the names of additional witnesses may be endorsed on an information at, or after, the commencement of a trial rests within the sound discretion of the trial court, and where such endorsement has been allowed, reversible error cannot be predicated thereon except for abuse of discretion." (Syl. ¶ 2.)

See, also, *State v. Morton,* 59 Kan. 338, 52 Pac. 890, and *State v. Howland,* 100 Kan. 181, 163 Pac. 1071.

The defendant claims there was a deliberate plot by the county attorney to secrete the witness Robert Holliman, Jr., by falsifying his true address. The point is not well taken. A Wichita address was listed on the information, and it is claimed the state knew the witness resided in Ft. Smith, Arkansas, and would never be found in Wichita. The record indicates the Wichita police department searched for the witness but was unable to locate him until after the trial was started, when he was returned to Wichita. The witness was present in court for several days during which time the defendant had ample time to interview him.

It is claimed the state failed to comply with the provisions of K. S. A. 62-1302 in that the clerk of the district court failed to deliver a copy of the information to the defendant or to his attorney at least 48 hours before he was arraigned. The record completely refutes the contention. As indicated, when the defendant was arraigned, the district court, on its own motion, raised the question, and statements of counsel in the record clearly negate the assertion.

The defendant claims the court erred in overruling his objection to the experimental test known as a "control test," for the reason that the conditions under which the test was conducted were not

similar or the same as the conditions at the Shadybrook address. The control test was run at Wichita State University to show how long the .32 caliber pistol had been lying on the lawn. It is basically claimed the control test was not conducted under similar or the same conditions which prevailed between the night of July 16, and the afternoon of July 20. The defendant concedes that evidence of an occurrence entirely disconnected with the one involved which tends to illustrate a physical fact, where the conditions are the same or similar, is relevant and admissible because the observed uniformity of nature raises an inference that like cause will produce like results. (*Wiggins v. Missouri-K.-T. Rld. Co.*, 128 Kan. 32, 276 Pac. 63.)

The evidence established that the same kind of grass as that in the lawn where the pistol was found was used; that the Bermuda grass grown and used in the test was under correctly controlled scientific conditions in a chamber in general use in botanical science which was so constructed that it enabled growing conditions for specific days to be set up in its environment; that the rainfall, temperature, and light conditions for July 16, through July 20, were used, and the rainfall data was from a United States Weather Bureau Station located four blocks from where the pistol was found. The persons who conducted the experiment were well qualified by the admission of the defendant.

The district court, after the requisite foundation was laid and the requisite similarity of conditions established, admitted into evidence colored transparencies of the control experiment which showed discolored areas of grass produced by having pistols lying in them for various lengths of time (3 or 4 days) which correponded with the discoloration and yellowing and growth of the grass which officers had observed upon finding the pistol. The test was relevant to determine how long the pistol had lain outside in the grass and the experiment was helpful to the jury in so determining. It is well established that scientific experiments may be shown in evidence as well as the testimony of experts in support thereof (K. S. A. 60-456; 29 Am. Jur., 2d, Evidence, §§ 818, 819, 822, 824, pp. 908-912.) It was a matter perculiarly within the discretion of the court to decide the admissibility of such evidence in the light of all the surrounding facts and circumstances. (*Casey v. Phillips Pipeline Co.*, 199 Kan. 538, 431 P. 2d 518; *Trimble, Administrator v. Coleman Co., Inc.*, 200 Kan. 350, 437 P. 2d 219; 29 Am. Jur. 2d, Evidence,

§§ 818, 820, 824, pp. 908-912.) This court has accepted evidence of scientific tests (*State v. Jones,* 41 Kan. 309, 21 Pac. 265; *State v. Asbell,* 57 Kan. 398, 46 Pac. 770; *Johnson v. Railroad Co.,* 80 Kan. 456, 103 Pac. 90), and we think the district court did not err in its ruling.

The defendant argues that since the officers did not find the .32 caliber pistol at the Shadybrook address on July 18, that fact established that it was not then lying outside where it was found on July 20. The argument is one properly addressed to the jury but it lacks merit when directed to an appellate court. No search of the yard was made on July 18. The question was one for the jury to determine and it made a reasonable determination.

The defendant next contends the district court erred in refusing to discharge him as to count 2 at the close of the state's evidence. The court charged the defendant with wilfully resisting and opposing Officer Stewart on July 18, in the discharge of his official duty in a felony case in violation of K. S. A. 21-717. The defendant argues the statute applies only to resistance in the execution of a warrant or other process, and since he was not told Stewart had a search warrant for the premises and that after being so advised, he made no opposition or resistance to the officer, the statute was not violated. The statute states, "or in the discharge of any official duty in any case of felony," and we are of the opinion the gravamen of the offense is resistance and opposition to the officer in the discharge of his official duty. (*State v. Merrifield,* 180 Kan. 267, 303 P. 2d 155.) The evidence showed that Stewart, while investigating two murders and a robbery which had in fact been committed and which he had reasonable grounds to believe the defendant had committed, was in fact resisted and opposed while performing that duty. When Stewart knocked on the screen door at the Stadium address, saying, "Police Officer, I would like to talk to you," there remained little question that he was an officer in the performance of his duty. The evidence showed the defendant was reaching for his .357 magnum pistol and got his hand on it, after being advised that a police officer wanted to speak to him. This court takes judicial notice of the lethal nature of a .357 magnum pistol. The intent of the defendant in reaching for his pistol is a state of mind and since such intent is not subject to direct proof, it can be gathered from the facts and surrounding circumstances. (*State v. Jensen,* 197 Kan. 427, 417 P. 2d 273.) Stewart's testimony

showed what he reasonably believed to be the defendant's intent in reaching for his pistol—that the defendant intended to kill him. In *Terry v. Ohio,* 392 U. S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, it was said:

". . . Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.

"In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." (pp. 23, 24.)

The record shows that because Officer Stewart was well trained in police discipline, he was successful in disarming the defendant and saving his own life. One need not wait until the rattlesnake strikes to protect one's self. He may act when the rattlesnake coils and thus ward off the deadly effect. Officer Stewart was not required to wait until the gun was pointed and the trigger pulled. He was in the discharge of his official duty in investigating a felony and we are of the opinion the district court did not err in overruling the defendant's motion to discharge him.

The defendant next contends the district court erred in overruling his objection to standing trial on the eight separate counts charged in the information and contends that each count did not require the same evidence, the same punishment, or the same mode of trial. The point is not well taken. In *State v. Anderson,* 202 Kan. 52, 446 P. 2d 844, the identical question was passed upon and it was held:

"Where separate and distinct felonies are charged in separate counts of one and the same information and all of the offenses charged are of the same general character, requiring the same mode of trial, the same kind of evidence, and the same kind of punishment, the defendant may be tried upon all of the several counts of the information at one and the same time, and in one trial. The fact that one of the counts with which the defendant is charged consists of the possession of a pistol after conviction of a felony, contrary to K. S. A. 21-2611, does not alter the foregoing rule.

"Whether a defendant in a criminal action who is charged with several separate and distinct felonies may be tried upon all of the several counts of the information at one and the same time, and in one trial, rests in the sound judicial discretion of the trial court." (Syl. ¶¶ 3, 4.)

See, also, *State v. Odle,* 121 Kan. 284, 246 Pac. 1003; *State v. Neff,* 169 Kan. 116, 218 P. 2d 248; *State v. Brown,* 181 Kan. 375, 312 P. 2d 832, and *State v. Hacker,* 197 Kan. 712, 421 P. 2d 40, cert. den. 386 U. S. 967, 18 L. Ed. 2d 119, 87 S. Ct. 1050.

The defendant argues that the pistol he was charged with possessing on June 5, was never identified at the trial. The record refutes the contention. Two witnesses, Holliman and Miss Bills, testified that on June 5, the defendant had possession of the pistol which was pointed at Miss Bills' head and the defendant threatened to discharge it. Moreover, the pistol was introduced into evidence without objection.

The defendant further contends that evidence of his cocking and playing with the .357 magnum pistol on July 18, approximately 48 hours subsequent to the murders, was prejudicial. We think the evidence was material. It tended to show the defendant's state of mind and his propensity to possess pistols, and was evidence of his possession of the weapon. Likewise, his argument that proof of possession of instruments with which to commit crimes was not proper, is ill-founded. See *State v. Montgomery,* 175 Kan. 176, 180, 261 P. 2d 1009; *State v. Omo,* 199 Kan. 167, 428 P. 2d 768, and 2 Wigmore on Evidence, 3d ed., § 238, p. 33. We are of the opinion the district court did not err in requiring the defendant to stand trial on the eight separate and distinct crimes charged in the information.

It is contended the district court erred in admitting into evidence all money as exhibits, over the defendant's objection. It is argued the state made no attempt to lay a foundation as to the defendant's financial worth prior to the seizure of the money introduced into evidence, and there was no showing of his marked financial improvement prior to or subsequent to the crimes alleged.

We think the state was not required to show the defendant's financial status prior to July 16, but that it need only show the sudden acquisition or rise in his financial condition subsequent thereto. The rule is that in the prosecution for crime where there is evidence of the guilt of the accused and the crime is of such a nature that the acquisition of money may be regarded as a natural or ordinary result of its perpetration, evidence is admissible of the

sudden acquisition of money by the defendant, or of a marked improvement in his financial condition at or subsequent to the time the offense was committed, although the source of the money is not definitely traced or identified by the prosecution. (91 A. L. R. 2d 1046, 1057, 1061.)

In the instant case, the evidence showed that in the early hours of Sunday, July 17, the defendant was observed at a local night club with money "sticking out" of his shirt pocket, and was buying liquor for his friends. He was laughing and joking with his friends later that same morning about the fact that Ralph Credit had taken $500 of his money and then proceeded to verify that fact. With respect to gambling on Sunday, July 17, the defendant was fought over by the "hustlers"—the professional gamblers who sought to part him from his money and who separated him from $1600, according to his own statement. It was the defendant who gave his sister-in-law a stack of money for safekeeping on Monday morning, July 18. It was also the defendant who spent over $100 that same morning to purchase a new magnum pistol and ammunition. All of those facts were before the jury for its consideration, and we think properly so. A similar contention was presented by the defendant in *State v. Gauger,* 200 Kan. 563, 438 P. 2d 463, and it was held the currency had a natural and logical connection under the circumstances shown by the evidence to raise a strong inference that he took the money, and was properly admitted. See, also, *State v. Grebe,* 17 Kan. 458; *State v. Anderson,* supra, and *State v. Cofer,* 73 Idaho 181, 249 P. 2d 197. We think the money in the case at bar was properly admitted into evidence. (K. S. A. 1967 Supp. 60-401; *In re Estate of Isom,* 193 Kan. 357, 394 P. 2d 21.)

Prior to the trial, the defendant requested the county attorney to produce the statements taken by the Wichita Police Department from certain named witnesses, and, further, to produce the statements of any witness not used by the state at the preliminary examination. The motion was heard and denied on December 15. We think the district court did not err. The statements were not official documents, nor a part of any court record. In *State v. Badders,* 141 Kan. 683, 42 P. 2d 943, it was said:

". . . the county attorney refused to deliver to defendant for inspection written statements made by the four young men to the county attorney in his office when he was attempting to learn the facts respecting the offense. It is sufficient to say defendant was not entitled to inspect such statements. They were in no sense public records and amounted to no more than memoranda

the county attorney might have made of what the witnesses told him. (See *State v. Laird*, 79 Kan. 681, 100 Pac. 637; *State v. Jeffries*, 117 Kan. 742, 232 Pac. 873; *State v. Furthmyer*, 128 Kan. 317, 277 Pac. 1019; *State v. Hooper*, 140 Kan. 482, 37 P. 2d 52.)" (l. c. 685.)

The defendant contends the district court erred in overruling his objection to the use of the *ex parte* transcript of the witness Clara Hopson and by improperly allowing the court reporter to verify the accuracy thereof from his notes taken at the time the statement was given. In discussing this point it is important to note that the defendant had given notice of alibi and his entire defense was based upon the fact that he had been with Mr. and Mrs. Johnny Hopson traveling from the Stadium address to his mother's home on Shadybrook at the time the shots were heard in Steen's store.

Prior to the preliminary examination subpoenas were issued and served upon Mr. and Mrs. Hopson to compel their testimony on behalf of the state. Both witnesses failed to obey the commands of the subpoenas. After the preliminary examination was concluded and the defendant bound over for trial in the district court, the county attorney issued a contempt citation to Mrs. Hopson for her failure to respond to the subpoena. Mr. Hopson was subpoenaed to testify before the county attorney pursuant to K. S. A. 62-301. At a hearing before the Court of Common Pleas, Mrs. Hopson testified under oath with respect to the charges against the defendant. The defendant was provided a copy of the transcript of the preliminary examination, but the testimony of Mrs. Hopson at the hearing on the contempt citation was not made a part of that transcript and the defendant was not provided a copy thereof.

The county attorney was fully justified in issuing the contempt citation since obedience to a subpoena is an important and necessary function of any trial or hearing, and the fact he obtained her testimony with respect to the charges against the defendant on the night in question was not improper. The investigatory powers of the state do not end with the conclusion of a preliminary examination, and the state has the right and duty at any stage of the proceeding to ascertain what a witness may testify to at the trial.

When Mrs. Hopson was called to testify on behalf of the state, she became in effect a hostile witness, testifying contrary to the statement she previously had given to the county attorney with respect to the time the defendant was traveling with the Hopsons from the Stadium to the Shadybrook address. Over the defendant's ob-

jection and with the court's permission, the county attorney used the witness' prior statement on direct examination to impair her credibility. At the trial, she testified it was 10:30 p. m., whereas her prior statement was that it was between 11:00 and 11:30 p. m. Mrs. Hopson admitted giving the prior written statement, but denied making any inconsistent statements and attacked the accuracy of the court reporter's notes and transcript.

The evasive answers of Mrs. Hopson to several of the questions put to her were tantamount to a refusal to admit the statements imputed to her and this was sufficient to warrant the state in showing, if it could, that she did make those statements. It is well settled that prior inconsistent statements made by a witness out of court may be shown to impair his credibility. (*State v. Donahue,* 197 Kan. 317, 416 P. 2d 287.) The rule is stated in *State v. Sorter,* 52 Kan. 531, 34 Pac. 1036, where it was held:

> While ordinarily a party may not impeach his own witnesses, nor offer evidence for that purpose, he is not conclusively bound by the statements which the witness may make; and where a party has been entrapped or deceived by an artful or hostile witness, he may examine such witness as to whether he had not previously made contrary statements; and may, in the discretion of the court, be permitted to show what such contrary statements were." (Syl. ¶ 5.)

Cases which have followed *Sorter* are *State v. Hamilton,* 74 Kan. 461, 87 Pac. 363; *State v. Terry,* 98 Kan. 796, 161 Pac. 905; *State v. Cole,* 136 Kan. 381, 15 P. 2d 452; *State v. Olthoff,* 141 Kan. 70, 40 P. 2d 384, and *State v. Barnes,* 164 Kan. 424, 190 P. 2d 193. The state had a right to rely on Mrs. Hopson's prior statements under oath, and her deviation therefrom during the course of the trial left the state with no alternative but to impeach her by the use of her prior inconsistent statement. (K. S. A. 60-422 [a].)

The defendant complains of the reading by the official court reporter of the prior statements made by Mrs. Hopson at the contempt hearing, which the reporter had transcribed. The reporter testified he had compared his notes with the transcript and that he put down and accurately transcribed what Mrs. Hopson said. Up until the time the court reporter read his notes of the prior inconsistent statements of Mrs. Hopson, she had denied making such prior inconsistent statements and, as indicated, had also attacked the veracity of the transcript. There was no abuse of discretion in admitting the court reporter's testimony and that portion of the transcript dealing with the time the defendant was traveling with the Hopsons, and the testimony with respect to his having a brown

paper sack.  In *State v. Gauger,* 200 Kan. 515, 438 P. 2d 455, it was held:

"Where a witness admits giving a prior written statement but cannot remember the contents thereof, or neither admits nor denies the same, there is ample foundation for admitting the statement itself for impeachment purposes, or at least the impeaching portion thereof." ( Syl. ¶ 1. )

As we view the matter, the district court, having considered the defendant's objection to the use of the prior inconsistent statements, properly exercised its judicial discretion in allowing the state to proceed, and it was within the province of the jury which of Mrs. Hopson's statements it would believe.

The defendant asserts that the district court's denial of his right to use the *ex parte* transcript for the purpose of cross-examining Mrs. Hopson prejudiced his substantial rights.  He cites and relies upon *State v. Aldrich,* 174 Kan. 335, 255 P. 2d 1027, which he claims supports the rule that the defense has a right to examine reports and statements used by the state's witnesses to refresh their memory.  However, it was there held it was not error to refuse defendant's counsel the right to examine a report as more fully described in the opinion.  Be that as it may, the defendant does not point out where the court's refusal prejudiced him.  He indirectly argues he was somehow deprived of an opportunity to ascertain what Clara Hopson would testify to at the trial, but such an assertion strains credibility.  She was defense counsel's client.  In fact, he claimed to represent her and her husband and a glance at the defendant's-cross-examination of Mrs. Hopson reflects a well-interviewed witness.  The granting or refusal of the accused's request for the production or inspection of a writing for the purpose of cross-examining the witness lies in the discretion of the district court, and in the absence of an abuse of discretion, no error can be predicted thereon. ( *State v. Oswald,* 197 Kan. 251, 262, 417 P. 2d 261.)

Throughout his brief, the defendant makes repeated assertions that evidence favorable to him was suppressed by the state.  The record does not support the assertion.  To illustrate: It is claimed the court refused to permit the defendant to present evidence favorable to him with respect to an alleged dermal nitrate test and that he was improperly denied the use of a hypothetical question.  The points are not well taken.  There was no evidence presented by the state of a dermal nitrate test.  However, the defendant sought to elicit that information on cross-examination of certain state witnesses.  The court sustained the state's objections to the defendant's

questions upon the ground of improper cross-examination. The ruling was proper. The defendant had only to call those witnesses to testify on his behalf. Yet he did not choose to do so. The same was true with respect to the hypothetical question. Likewise, the defendant's claim that the search warrants for the Stadium and the Shadybrook premises were not issued upon probable cause, lacks substance. No further comment on this point is necessary except to say that the detailed verified applications of the police officer to procure the search warrants were based upon his personal knowledge of information amassed by the police department that the crimes of murder and robbery had been committed, and that the affiant had received reliable information from a credible person whose truthfulness he had reason to believe, that the defendant was in possession of a large sum of money and had stated he shot those two "M___ F's___ in the head," thus reciting the underlying circumstances which were essential for the magistrate to perform his detached function of determining probable cause, and that the warrants were issued in conformity with K. S. A. 62-1828, *et seq.;* Section 15 of our Bill of Rights, and *United States v. Ventresca,* 380 U. S. 102, 13 L. Ed. 2d 684, 85 S. Ct. 741.

The defendant's reliance on *Aguilar v. Texas,* 378 U. S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509, is without merit. In that case, unlike here, the magistrate had no facts and circumstances made known to him upon which to form a judgment. Here, the defendant had a full and complete hearing upon his search warrant arguments prior to the trial. As a result, it clearly appeared that a neutral and detached magistrate found facts which warranted him as a reasonably cautious man in the belief that the evidence sought to be obtained was at the locations named in the warrants, which were amply justified by the evidence amassed by the police, and there was no abuse of discretion by the court. Since the warrants were lawfully issued, the searches conducted thereunder were proper in all respects. Moreover, the fact that the officers searched inside the house on Shadybrook on July 18, and searched outside the house on July 20, does not uproot the validity of the search warrants. The warrants being issued on probable cause, the searches conducted thereunder were proper in all respects.

The defendant's argument that the officers were not warranted in taking the handkerchief found between the old car and the hedge, which was not described in the search warrant, is not well

founded. The handkerchief was lying in close proximity to the .32 caliber pistol and the officers were justified in taking it into custody. The mere evidence rule was never the law in Kansas (K. S. A. 62-1829), and the Supreme Court of the United States recently abandoned the mere evidence rule in *Warden, Maryland Penitentiary v. Hayden,* 387 U. S. 294, 18 L. Ed. 2d 782, 87 S. Ct. 1642.

The claim is made the district court improperly instructed the jury on flight in that it advised the jury that if it found from the evidence the defendant, soon after the commission of the offenses alleged in the information, fled to avoid arrest and trial, it might take that fact into consideration in determining his guilt or innocence; that his flight, if he did flee, was not sufficient in itself to establish guilt, but was a circumstance which the jury might consider in determining the probability of his guilt or innocence, and that the weight to which that circumstance is entitled is a matter for the jury to determine in connection with all the facts brought out in the case. While the evidence of flight was scanty, we are of the opinion the giving of the instruction was not prejudicial error.

Counsel for the defendant displayed vigor and industry in representing the defendant in the trial of this case and has been diligent in advancing claims of error here. Those discussed in detail have been disposed of; others raised have been meticulously examined to determine whether any possible error prejudicial to the rights of the defendant occurred.

Our review of the record compels the conclusion that the defendant was given a fair and impartial trial and that no grounds exist, specified or not, which would necessitate a reversal. The record discloses there was a basis in the evidence from which the jury could infer the defendant's guilt. The judgment rendered by the district court against the defendant in conformity with the verdict of the jury, and the respective sentences imposed, is affirmed.