No. 46,050

THE STATE OF KANSAS, *Appellee*, v. RANDALL CLAIR HILL, *Appellant*.

(507 P. 2d 342)

Opinion filed March 3, 1973.

*A. J. Focht,* of Smith, Shay, Farmer & Wetta, of Wichita, argued the cause and was on the brief for the appellant.

*Keith Sanborn,* county attorney, argued the cause, and *Vern Miller,* attorney general, and *Stephen M. Joseph* of Wichita, were with him on the brief for the appellee.

The opinion of the court was delivered by

OWSLEY, J.: This is an appeal from convictions on charges which arose from criminal acts of defendant, including assault, robbery, kidnapping at gunpoint, and murder, perpetrated April 13, 1969, in Wichita.

Defendant, Randall Clair Hill, and his victim, Robert C. Koon, also known as Bob Evans, arrived at the Red Slipper Club in Wichita about 6:00 p. m. on Sunday, April 13, 1969. Although the private club had not yet opened for business that day, they were admitted by one of the owners and were served drinks. About 8:30 p. m. they were joined by acquaintances Homer Hoffine, Cecil Jordan, and Jacqueline (Jackie) Casto. A short time later they were joined briefly by Sharon Higgins, also known as Sharon Hill, defendant's putative wife, who gave defendant a handgun and left. Hill put the gun under his belt and concealed it by pulling his sweater over it.

An argument developed between Hill and Evans over some money Evans left on the bar. Hill told Evans he was going to take the money and did so. They then began arguing about Evans' relationship with Sharon. At defendant's suggestion, they went outside to fight and settle the matter. The barmaid saw them fighting on the sidewalk in front of the Red Slipper and several witnesses observed a bleeding cut over Evans' eye when they re-entered the club. Prior to going outside with Hill, witnesses observed Evans in possession of a large sum of currency. Evans told Jackie Casto that Hill pistol-whipped him and that he could not leave because Hill had all his money.

Hill, Evans, Jordan, Hoffine, and Casto sat around the same table and Hill continued to accuse Evans of intimacies with Sharon. Hill pulled the gun out of his belt and hit Evans on the head with it. This again cut Evans. Hill told Evans they should leave and he [Hill] should kill him for his relationship with Sharon. Evans expressed reluctance to leave with him, saying Hill would have to kill him then and there if he was going to. Hill stated he would kill Jackie Casto if Evans did not go with him. Hill threw his car keys on the table and gestured with his gun to the effect that Cecil Jordan was to go with them and drive Hill's car. Hill marched Jordan and Evans out of the Red Slipper at gunpoint.

Outside, Hill ordered Evans to put his hands up and told Jordan

to get in and drive the 1969 Plymouth Road Runner. Hill opened the door on the passenger side, forced Evans to get into the front seat, lean forward and put his hands on the instrument panel. Hill then got into the back seat behind Evans, gun in hand, and instructed Jordan to drive to 1234 Alturas in Wichita, Hill's residence.

Sharon and another witness, Patty Whetstone, were in the parking lot of the Red Slipper at this time and observed these events. They immediately drove to a nearby telephone and called the Wichita Police Department, describing the car and occupants and telling the dispatcher they had better catch the car because one of the occupants was drunk and holding a gun on another. Sharon called again later to correct the street location of the car. These conversations were recorded by a police tape recorder.

On the way to Hill's house, where Evans was staying temporarily, Evans asked Hill to give back forty dollars of his money and to let him catch a bus out of town. Hill agreed. They continued to Hill's house to get Evans' suitcase. They parked in the drive and Hill sent Jordan into the house to get Evans' suitcase and to remove his gun from it. When Jordan returned to the car, he had the suitcase in one hand and Evans' gun in the other. Hill grabbed the gun from Jordan and told him to put the suitcase in the trunk of the car. Jordan did so then went back to lock the front door of the house. Returning to the car, Jordan heard a gun discharge inside the car and saw the bullet go through the windshield, lodging in the garage door. Jordan opened the driver's door and asked what happened. Hill said he shot Evans because he admitted to sexual relations with Sharon and they must take his body to the country to bury it. Hill ordered Jordan to drive and warned him to be careful or he would shoot him, too.

They drove to a rural area of Sedgwick County and stopped by an open field. Jordan got out of the car and opened the passenger door. Evans' body fell out sideways, half in and half out of the car. Hill started to get out of the car from the right rear door and stopped directly over the upper half of Evans' body. He put the gun to Evans' head and shot him twice more. Hill got completely out of the car and ordered Jordan to drag Evans' body to the side of the road and cover it with brush.

They then drove back to Wichita to find a shovel with which to bury Evans' body, eventually returning to defendant's house on Alturas Street. Hill broke the right side of the Plymouth's wind-

shield so the bullet hole would be destroyed. They went into the house and changed clothes, Hill attempting to clean the blood off the clothes he had been wearing. Sharon called and Hill told her to come home. Hill and Jordan later left in her red 1967 Ford to retrieve Evans' body. With Hill driving they picked up the body and proceeded to a deserted farm with which Hill was familiar near Wilson, Kansas, and buried the body under a stock tank. They returned to Wichita early in the morning of April 14, 1969.

Later in the morning of April 14, 1969, they returned to the location on 63rd Street South in rural Sedgwick County where they first left Evans' body to recover his jacket. They found it, drove about a half mile and threw it out the window. The jacket was later found by police near the intersection of 63rd Street South and Greenwich Road. The previous night, Hill had taken Evans' billfold from his pocket, looked through it, and had thrown it out the car window. The billfold was found later near the intersection of 63rd Street South and K-15.

Still later, on April 14, 1969, Jordan got away from Hill and rejoined Jackie Casto. On April 15, 1969, they informed Sheriff Vern Miller of the murder and sought protective custody, fearing retaliation by Hill or his friends. Hill was arrested April 15, 1969, as he was leaving town with Sharon in a rented Mustang. He was charged with assault, kidnapping and murder. After a week-long preliminary hearing, a fourth count of robbery was added to the information.

Despite the plethora of evidence, including witnesses to the criminal acts of defendant, or perhaps because of it, a five-week trial was conducted. Defendant was found guilty of robbery, kidnapping and murder, all in the first degree, and felonious assault. He was sentenced to two consecutive life sentences for kidnapping and murder, respectively; one to ten years for felonious assault; and ten to twenty years for first degree robbery, the latter two sentences to be served concurrently.

Defendant specifies thirty-seven errors which will be consolidated for the purposes of this opinion. This case was tried prior to the adoption of the new code of criminal procedure. Several points concern defendant's right to pretrial discovery. Rulings of the trial court on defense requests for discovery of evidence in state's possession are within the discretion of the trial court and will be set aside by this court only upon a showing of an abuse of discretion.

(*State v. Martin*, 206 Kan. 388, 390, 480 P. 2d 50.) Defendant's motion for discovery was granted in part. Statements of defendant and names and addresses of witnesses were allowed to defendant. Pretrial discovery of statements of witnesses; criminal records of witnesses, victim, and defendant; physical evidence, including photographs and laboratory reports; and exculpatory or impeaching evidence were denied. The court's denial of defendant's motion to discover exculpatory evidence was not prejudicial error. Defendant did not indicate any theory of defense which would aid the court in identifying exculpatory evidence among the mass of incriminating evidence. Defendant does not now nor did he ever set forth specific items of evidence in the state's possession which are exculpatory, nor does he on appeal claim there is in existence exculpatory evidence which is suppressed. Denial of a later motion for *in camera* inspection of prosecution files was justified for the same reasons.

The prosecuting attorney is under a positive duty, independent of any court order, to disclose to the defense all exculpatory evidence. (Kansas Supreme Court Rule No. 501, Code of Professional Responsibility, DR 7-103 [B], 205 Kan. lxxxviii.) The circumstances under which the suppression of evidence could render a conviction constitutionally infirm, summarized in *United States v. Keogh*, 391 F. 2d 138, 146, 148 (2nd Cir. 1968), are: (1) Deliberate bad faith suppression for the very purpose of obstructing the defense or the intentional failure to disclose evidence whose highly probative value to the defense could not have escaped the prosecutor's attention; (2) deliberate refusal to honor a request for evidence where the evidence is material to guilt or punishment irrespective of the prosecutor's good faith or bad faith in refusing the request; and (3) where suppression was not deliberate and no request for evidence was made, but where hindsight discloses it was so material that the defense could have put the evidence to significant use.

In order to cause reversal the evidence suppressed must be clearly and unquestionably exculpatory and suppression clearly prejudicial to defendant. In this case, defendant complains that despite the positive duty imposed upon the state by professional standards he was denied knowledge of the whereabout of his Plymouth Road Runner and enlarged copies of two pictures. However, defendant does not show what use would have been made of them by defense or how their denial was prejudicial. Both items were

eventually admitted into evidence where defendant had access to them for cross-examination and neither could be said, even with the benefit of hindsight, to be unquestionably or even potentially exculpatory. Defendant's inferences of wrongdoing and suppression of exculpatory evidence by the state are not supported by the record nor does the record support his claim of reversible error on the part of the court in not ordering pretrial discovery of, or *in camera* inspection for, exculpatory evidence.

It is incumbent upon the accused to show that evidence favorable to him, sought by a discovery motion, is material to either guilt or punishment. (*Brady v. Maryland.*, 373 U. S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194; *Alston v. State*, 11 Md. App. 624, 276 A. 2d 225; *Campos v. State*, 468 S. W. 2d 81, [Tex. Crim. 1971].)

Defendant claims error in denial of his motion to discover statements of witnesses. This court has held that statements of witnesses in the state's possession are not official documents nor part of any court record and therefore are not subject to discovery by defendant before trial. (*State v. Jones*, 202 Kan. 31, 46, 446 P. 2d 851.) Pretrial statements of witnesses are available to the defense only after the witnesses have testified. This is in accord with the Jencks Act, 18 U. S. C. A. § 3500, and like provisions have been made a part of the new code of criminal procedure by K. S. A. 1972 Supp. 22-3213. We acknowledge that in so limiting defendant's access to witnesses' statements Kansas does not meet American Bar Association Standards for Criminal Justice. (A. B. A. Standards for Criminal Justice, Approved Draft, 1970, Discovery and Procedure Before Trial, § 2.1, p. 52.) The A. B. A. Standards state one of the purposes of broadening the scope of pretrial discovery in criminal cases is to promote an expeditious as well as fair determination of the charges. This case was decided after a week-long preliminary hearing, several pretrial hearings on motions, and a five-week trial. The appeal was documented by a three-volume record containing more than 900 pages. Six of the defendant's thirty-seven points on appeal allege error in denying some form of pretrial discovery or prosecution suppression of evidence. While denial of full discovery in this case did not prejudice defendant's rights, it is difficult to see how granting his discovery motions would have in any way hindered or lessened the effectiveness of the prosecution, and granting full discovery might have saved both time and expense in preparation of the defense. K. S. A. 1972 Supp. 22-3212, places

broader discovery within the discretion of the trial court and we urge the trial courts to use these discretionary provisions to effect economies in time, money, and judicial and professional talents, and to permit thorough preparation for trial on both sides. The intent of the code of criminal procedure is to be effected by prosecutors, trial courts, and defense attorneys construing its provisions to secure simplicity in procedure, fairness in administration, and elimination of unjustifiable expense and delay. (K. S. A. 1972 Supp. 22-2103.)

Defendant alleges the prosecution waived its executive privilege to keep files in confidence and it was error to deny him access to statements of witnesses and other material in prosecution files when news media had free access to such material. To prove such access defendant made a proffer of evidence from twenty witnesses, eighteen of whom were newsmen, that they had published news stories, including a story for a detective magazine, based upon the files of police and statements of police about this case. Defendant does not argue prejudice from pretrial publicity in these news stories; only that he should have equal access to police files because of his greater interest. The proffer was denied on the ground it was irrelevant to the discovery issue contained in defendant's motion with which ruling we agree. The propriety of the conduct of police in relation to news reporters and pretrial publicity is not connected in any way with the rights of defendant to discovery of evidence in the state's possession.

Defendant moved for mistrial at the close of the state's evidence, alleging prejudice from two news stories published during the trial. One story revealed the in-court discussion of evidence not presented to the jury. The stories are not included in the record presented to this court, making it impossible to determine their effect upon defendant's right to a fair trial. To assume any effect at all would necessitate a further assumption that jurors read such stories during the course of the trial despite judicial instruction to the contrary. Trial court reprimanded the reporter who wrote the story and sustained defendant's motion to poll the jury. All thirteen members advised the court they were not aware of any evidence produced outside the trial. Absent proof of jury misconduct, we find no merit to defendant's claim of error in not granting mistrial on this ground.

Defendant claims trial court erred in denying defendant's pretrial motion for conditional examination of prosecution witnesses.

K. S. A. 62-1315 (now K. S. A. 1972 Supp. 22-3211) allows for defendant's deposing witnesses and use of such depositions conditionally.

Neither party has cited any Kansas case which construes the word "conditionally." Defendant attempts to construe K. S. A. 62-1315 and K. S. A. 60-265 together and apply the rules of civil procedure as basis for his right to take these depositions. It is the state's position that depositions may be taken according to the method provided in the code of civil procedure, but only upon the showing of need to perpetuate testimony against loss before trial. The state defends the trial court's ruling for the reason defendant did not make the necessary showing. The state's brief then traces the history of K. S. A. 62-1315, showing "conditionally" to be synonymous with "de bene esse" and from that history argues the only basis for taking depositions in criminal matters is a showing of need to perpetuate testimony. Use of the word "conditionally" in the statute necessarily implies the depositions can only be taken under certain circumstances as distinguished from a right to take depositions generally. This position is supported by the following from 26A C. J. S., Depositions, § 6, pp. 294, 295:

"The phrase 'de bene esse' means 'provisionally,' and refers to the right to use the deposition in the event of the absence of witness at the time of the trial. Statutes which confer the right to take depositions to be used in a pending action conditionally are generally held to refer to conditional use as distinguished from conditional taking; but in such a case a party does not have an absolute right to take depositions before trial, and the purpose must be a bona fide effort to perpetuate testimony, or the taking of depositions will not be allowed. . . ."

Our interpretation of K. S. A. 62-1315 is that the condition referred to in the statute is the need to perpetuate testimony and in the absence of a showing of such necessity the motion was properly denied. K. S. A. 1972 Supp. 22-3211, the section of the new criminal code which incorporates K. S. A. 62-1315, supports this interpretation by specially requiring a showing of a need to perpetuate testimony.

Defendant claims the court erred in denying his motion to quash the information because it left him in doubt as to which assault and which kidnap and which robbery he was being tried for, which shooting was basis for the murder charge, which forced trip was the basis of the kidnap charge, and whether additional acts or the same acts of violence were the basis of the aggravated first degree charges. Defendant argues he could not know from the

information what he could safely plead guilty to and avoid future jeopardy. He cites *State v. Gauger,* 200 Kan. 515, 525, 438 P. 2d 455, as authority for this argument, which is not persuasive. The problem in *Gauger* was that there was but one act of violence for which two crimes were charged, *i. e.,* robbery and assault with intent to rob. Two separate convictions cannot be carved out of one act of criminal delinquency. However, in this case the state has no difficulty in finding separate criminal acts with which to support each of the four charges against defendant, plus many separate acts of premeditated violence to support the aggravated first degree charges. The charges in the information were in substantially the same language as the statutes violated, which is sufficient. (*State v. Ashton,* 175 Kan. 164, 262 P. 2d 123; *Carithers v. State,* 207 Kan. 607, 485 P. 2d 1368.)

Defendant charges the court erred in denying his motion for a bill of particulars. The function of a bill of particulars in a criminal action is to amplify the information by stating more minutely and particularly the charges against the defendant to the end that defendant is able to prepare his defense and avoid surprise. Defendant makes no showing of surprise or prejudice. Charges in the information were clarified by facts brought out at the preliminary hearing. The need for amplification, if any, was met and the trial court correctly ruled there was no need for a bill of particulars. (*State v. Martin,* 175 Kan. 373, 265 P. 2d 297; *State v. Eason,* 163 Kan. 763, 186 P. 2d 269.)

Defendant entered a plea in abatement on ground he did not have a proper preliminary hearing on the fourth count, first degree robbery. It was added upon evidence produced at the preliminary hearing. Defendant alleges he was not allowed to cross-examine witnesses on the charge at the preliminary hearing. The record shows defendant presented his plea three months after arraignment and after the granting of a continuance. The plea was correctly ruled untimely and denied. (*State v. Addington,* 205 Kan. 640, 472 P. 2d 225; *State v. Jones,* 202 Kan. 31, 39, 446 P. 2d 851.) Even if timely, the plea in abatement should have been denied. Defendant, after a preliminary hearing, may be bound over on any charges satisfactorily proven at the preliminary hearing even if different from those charged in the complaint. (*State v. Scott,* 210 Kan. 426, 502 P. 2d 753.)

Defendant bases several allegations of error on the question of

the status of Sharon Higgins, his putative wife. She and defendant participated in a marriage ceremony, complete with certificate, in 1968 in Oklahoma. At the time of that marriage Sharon believed herself single because her former husband, Howard Higgins, indicated he had obtained an *ex parte* divorce. The divorce was never obtained. Therefore, Sharon was not legally defendant's wife and he could not claim his marital privilege against her testifying for the state. Defendant moved to suppress evidence gathered from his home and car, pursuant to a search warrant issued on basis of her testimony against him. That motion was properly overruled.

Upon being denied the marital privilege not to testify, Sharon claimed her own fifth amendment privilege not to incriminate herself. Defendant claims it was prejudicial error to force her to claim that privilege before the jury. The record shows the following testimony by Sharon:

"Q. Would you please state your name?

"A. Sharon L. Hill.

"Q. Where do you live?

"A. 4436 East Bailey.

"Q. Do you have any other name by which you are known other than Sharon L. Hill?

"Mr. Focht: To which I object as not relevant or material.

"The Court: Sustained.

"Q. Were you—what was your former address?

"A. I refuse to answer on the grounds it might incriminate me."

The jury could have inferred from her refusal to give her former address only that she and defendant were living at the same address when Evans was killed. She was neither a co-defendant nor charged with any crime, and refusal to answer did not establish any vital elements of charges against defendant or add critical weight to state's case. Under these circumstances, the denial of defense motion to claim the privilege against self-incrimination outside the presence of the jury was not prejudicial error. (*State v. Chaffin*, 92 Idaho 629, 448 P. 2d 243, [1968]; *State v. Boyland*, 27 Utah 2d 268, 495 P. 2d 315, [1972].)

Defendant based a motion for mistrial upon the fact that prosecutor, in his opening statement, stated that Sharon would testify to certain facts, *i. e.*, that she was afraid of defendant, telephoned the police after seeing defendant kidnap Jordan and Evans, saw them later at defendant's house, and later had her Ford cleaned to remove blood traces. She did not so testify, claiming her fifth

amendment privilege. Defendant alleges it was error to allow prosecutor's remarks to remain before the jury as though in evidence, citing *State v. Stephenson*, 191 Kan. 424, 381 P. 2d 335. We conclude no prejudice arose from these remarks to the jury since these facts were established in evidence by other witnesses and not by prosecutor's remarks during opening statement. Trial court correctly overruled this motion at the close of prosecution evidence.

Defendant asserts trial court erred in admitting police tape recordings reproducing Sharon's calls to police. Since she elected not to testify, defendant alleges he was denied the opportunity to confront her. Her statements were admissible because they fall within the exception to the hearsay rule provided in K. S. A. 60-460 (*d*) (3) as a statement of an unavailable witness narrating or describing an event recently perceived prior to commencement of the action. "Unavailable as a witness" includes situations where the witness is exempted on the ground of privilege from testifying concerning the matter to which his statement is relevant. (K. S. A. 60-459 [*g*] [1].)

Exhibit 10 is a 24-hour, 8-track tape recording of communications into and out of the Wichita Police Department from 6:45 a. m., April 13, to 6:45 a. m., April 14, 1969. Exhibit 2 is the tape recording of excerpts containing Sharon's voice taken from Exhibit 10. Defendant alleges these tapes were erroneously admitted into evidence without proper foundation. The record discloses three officers of the Wichita Police Department testified to the following facts: The police department recording equipment operates automatically and continuously; two officers listened to 186 hours of continuous recorded messages on the 24-hour, 8-track tape and marked the portions containing Sharon's telephone messages and the police broadcast resulting therefrom; and those portions were then re-recorded on adequate equipment operated by a skilled technician. Officers further testified to the fact their voices were on this tape and they remembered the conversations. The record shows sufficient foundation for admitting these exhibits into evidence.

Cecil Jordan and his wife, Jackie Casto Jordan, were material witnesses for the prosecution. From the beginning of the violent actions of defendant April 13, 1969, through the period of the trial, they informed police they were afraid of violence to themselves by defendant or his friends. After reporting defendant's crimes they were allowed to live at the jail for their protection. They were

intimidated by remarks of defendant's friends outside the court-room during the trial and for this reason the court found it unwise to supply defendant with an accurate address for them before and during trial. Defendant asserts without their address he was denied his right to discover independent evidence about them, their neigh-borhood, associates and activities, and to effectively cross-examine these witnesses for impeachment purposes. Defendant cites *Alford v. United States*, 282 U. S. 687, 75 L. Ed. 624, 51 S. Ct. 218, and *Smith v. Illinois.*, 390 U. S. 129, 19, L. Ed. 2d 956, 88 S. Ct. 748, for the proposition that a defendant is entitled as a matter of due process on cross-examination to a prosecution witness's address. We have no quarrel with that general rule, but it is not unqualified. Mr. Justice White, in his concurring opinion in *Smith,* recognized that questions which tend merely to harass, annoy, or humiliate a witness may go beyond the bounds of proper cross-examination, and questions which tend to endanger the personal safety of the witness might also be considered improper. In these situations, he suggests the trial court should be apprised of witness's reasons for not wishing to answer, then make an informed discretionary ruling. Protection of the personal safety of a witness is a desirable and necessary qualification of the general *Alford-Smith* rule. In this case the court had been informed on several occasions of various threats against these witnesses. Defendant showed only a general need for the address and showed no prejudice from lack of the address as opposed to the state's interest in protecting the witnesses. Balancing these competing interests we find the trial court did not abuse its discretion by its ruling that witness need not answer the question as to his correct address.

Defendant challenged the jury array and moved to quash the venire on ground it contained a disproportionate number of men to women. Defendant shows no constitutional significance or prejudice to his right to a fair trial arising from this fact. We find no merit to this challenge based upon our lengthy discussion of this issue in *State v. Stanphill,* 206 Kan. 612, 619, 481 P. 2d 998. (See also *State v. Roth,* 207 Kan. 691, 692, 486 P. 2d 1385.)

Defendant also objected to the same jury determining guilt and assessing punishment. An accused is not deprived of constitutional rights or due process by a unitary trial wherein a jury determines guilt and in the same proceeding determines the penalty. (*Zimmer v. State,* 206 Kan. 304, 477 P. 2d 971; *State v. Roth,* supra.)

A careful examination of all of defendant's claims of error, whether discussed herein or not, discloses no trial error which would justify the granting of a new trial. No error being shown, the judgment is affirmed.