No. 45,420

STATE OF KANSAS, *Appellee,* v. WILLIAM H. ADDINGTON, *Appellant.*

(472 P. 2d 225)

Opinion filed July 17, 1970.

*Shelley Graybill,* of Elkhart, argued the cause, and was on the brief for the appellant.

*Keith Sanborn,* county attorney, and *R. K. Hollingsworth,* deputy county attorney, argued the cause, and *Kent Frizzell,* attorney general was with them on the brief for the appellee.

The opinion of the court was delivered by

O'CONNOR, J.: The defendant has appealed from his conviction by a jury on one count of making false entries in a book of accounts of a moneyed corporation. (K. S. A. 21-618.) The jury was unable to agree on ten other counts with which defendant was charged— five counts of issuing warehouse receipts for grain not received (K. S. A. 34-290) and five counts of issuing warehouse receipts containing false statements (K. S. A. 34-291)—and a mistrial was declared. Hence, we confine our attention to questions relating to only the one count upon which conviction was had.

The factual background of the case will be developed as defendant's numerous contentions on appeal are considered. We turn first to the proceedings prior to trial in district court.

Defendant was originally charged in Reno county, but in *Addington v. State,* 199 Kan. 544, 431 P. 2d 532, we ordered him discharged

because venue for the prosecution of the offenses did not lie in that county. Thereupon, prosecution was begun in Sedgwick county on September 12, 1967, with the filing of a complaint duly subscribed and sworn to under oath by S. J. Reda, a warehouse examiner, before a deputy clerk of the court of common pleas, charging defendant with the ten counts upon which the jury subsequently reached an impasse. A warrant was issued, signed by the deputy clerk. The return shows defendant was arrested September 14, at which time he appeared before the court and waived the reading of the complaint and warrant. Defendant's counsel moved to quash the warrant and dismiss the complaint for the reason the matter was still pending in Reno county. The court took no action on the motion but set a date for preliminary hearing and fixed bond at $1,000. Defendant was released upon making bond.

On September 28, defendant filed a motion to dismiss and quash the warrant for the reason the complaint was not made to a magistrate, no witnesses were examined on oath, and probable cause was not found to exist by a court or magistrate, contrary to K. S. A. 62-602 and the federal and state constitutions. The following day the case came on for preliminary hearing. Prior to the argument of defendant's motion the county attorney presented the magistrate with an amended complaint and requested that Mr. Reda be sworn to sign it. After swearing the allegations of the complaint were true, Reda signed it before the magistrate, who issued an amended warrant upon which the defendant was immediately arrested in open court.

The amended complaint and warrant were identical to the original, except there was added Count 11, charging defendant with the offense of which he was convicted.

The court announced defendant's motion to quash and dismiss would be considered as having been lodged against the amended complaint and warrant, since the matter was now moot as to the original complaint and warrant. Further ruling on the motion was reserved until after both parties presented their evidence at the preliminary hearing, at which time the motion was overruled. Defendant was bound over for trial on all eleven counts and made bond for appearance in the district court.

After an information was filed, defendant, by way of habeas corpus, attacked the proceedings in the court of common pleas on the basis the original complaint and warrant were void and there

was no evidence to support a finding of probable cause. The writ was denied.

At arraignment on the information defendant stood mute, and pleas of not guilty were entered in his behalf. Thereafter he filed a plea in abatement on the grounds the warrant and amended warrant were not issued by a magistrate upon a finding of probable cause; that as to Count 11, the evidence before the magistrate was insufficient to show a crime had been committed, or probable cause to believe defendant committed it; and further, the state failed to show venue of the offense in Sedgwick county. The plea was overruled and the case came on for trial March 25, 1968, in district court.

The first two specifications of error relate to the validity of the original warrant issued by the deputy clerk of the court of common pleas and the amended warrant issued by the examining magistrate. The argument is made that the deputy clerk was without power and authority to issue a warrant, and that the amended warrant issued by the magistrate on a complaint containing only the naked allegations of the elements of the offense in the words of the statute, without examination of the complainant, was void. Both contentions are without foundation and cannot, under the circumstances, be used as a basis for vitiating defendant's conviction.

With respect to the issuance of the original warrant, that matter became moot when an amended complaint was filed and an amended warrant issued. Furthermore, under the prior decisions of this court, any objection defendant may have had to the power or authority of the deputy clerk to issue the warrant was effectively waived when defendant voluntarily gave bond for appearance at his preliminary hearing at a later date. (*State v. Munson,* 111 Kan. 318, 206 Pac. 749; *State v. Miller,* 87 Kan. 454, 124 Pac. 361; *State v. Longton,* 35 Kan. 375, 11 Pac. 163; 2 Hatcher's Kansas Digest [Rev. Ed.], Criminal Law § 87.) The only objection defendant registered to issuance of the original warrant was that the Reno county prosecution was still pending. Before the court ruled on the motion to quash, defendant gave bond, and he was no longer held by virtue of the original warrant.

The amended complaint upon which the amended warrant was issued was sworn to positively, under oath, before the magistrate. In such case, and particularly when the crime was charged substantially in the language of the statute, the requirement of the Bill of Rights, that no warrant shall be issued but on probable cause

supported by oath or affirmiation, is satisfied by the charge made and the positive form of the verification. (K. S. A. 62-602; see, *Holton v. Bimrod,* 61 Kan. 13, 58 Pac. 558.) The allegations of the complaint positively sworn to provided the magistrate sufficient basis for making the requisite finding of probable cause to issue the warrant. If there was any deficiency as to probable cause, that was cured by the fact the motion to quash was not acted on until after all the evidence was produced at the preliminary hearing and the court ruled that the crimes had been committed and there was probable cause to believe defendant committed them. (See, *State v.* Jones, 202 Kan. 31, 446 P. 2d 851.)

Despite what has been said, the state suggests, and we believe rightly so, that the short answer to defendant's challenge to the legality of his arrest is that his arrest on the amended warrant, even if defective or irregular, did not void his subsequent conviction. In *Kinnell v. State,* 205 Kan. 445, 469 P. 2d 348, we held:

"An illegal arrest and detention do not, standing alone, invalidate a subsequent conviction (*Baier v. State,* 197 Kan. 602, 419 P. 2d 865; *State v. Dobney,* 199 Kan. 449, 429 P. 2d 928; *Wheeler v. State,* 202 Kan. 134, 446 P. 2d 777; *Moreland v. United States,* 347 F. 2d 376 [10 CA, 1965]; *Davis v. United States,* 416 F. 2d 960 [10 CA, 1969]; *United States ex rel. Ali v. Deegan,* 298 F. Supp. 398 [SD, NY, 1969])." (pp. 445-446.)

The law is well settled that jurisdiction of a court to try a person accused of a crime is not divested by the fact he may have been unlawfully arrested. (*Williams v. State,* 197 Kan. 708, 421 P. 2d 194; *Hanes v. State,* 196 Kan. 404, 411 P. 2d 643; *State v. Cook,* 194 Kan. 495, 399 P. 2d 835.)

In attacking the validity of the amended warrant on the ground there was no finding of probable cause, defendant relies heavily on *Giordenello v. United States,* 357 U. S. 480, 2 L. Ed. 2d 1503, 78 S. Ct. 1245. We think the case has no application to the facts here. The defendant in *Giordenello* attacked the legality of his arrest on a narcotics charge on the ground that the complaint did not provide sufficient basis on which the commissioner could make a finding of probable cause for issuance of the arrest warrant. The court held the arrest was unlawful because the warrant was issued on a defective complaint and, as a consequence, narcotics seized at the time of the arrest were the product of an illegal search and were inadmissible as evidence. The case is not authority, as defendant contends, for the proposition that an arrest made without probable cause deprives a court of jurisdiction of the person arrested. It

relates fundamentally to the question surrounding the use of evidence obtained incident to an unlawful arrest. (See, *Ewing v. United States,* 404 F. 2d 625 [10 CA, 1969], cert. denied 396 U. S. 858, 24 L. Ed. 2d 109, 90 S. Ct. 125; *United States ex rel. Orsini v. Reincke,* 286 F. Supp. 974, 397 F. 2d 977, cert. denied, 393 U. S. 1050, 21 L. Ed. 2d 692, 89 S. Ct. 689 [1969].) Unless a defendant's substantial rights are prejudiced as a direct result of an unlawful arrest, such as the use of evidence seized at the time, his arrest will not vitiate his subsequent conviction. The record here is barren of anything stemming from defendant's arrest, even if illegal, that prejudicially affected his substantial rights at trial.

We need but pause briefly with regard to defendant's assertion the district court erred in overruling his plea in abatement. Under the circumstances presented in the record, the right to plead in abatement was waived. On September 29, 1967, defendant was bound over to appear at the next term of the district court (January 1968). He filed a motion for continuance of the case over the term on February 6, which was denied February 9. On the latter date defendant was arraigned on the information. His plea in abatement was not filed until February 19, which, of course, was after he had sought a continuance and been arraigned. What was said in *State v. Jones,* supra, is controlling, and disposes of the point:

". . . Pleas in abatement are dilatory pleas and are not favored by the courts. (*Walker v. United States,* 93 F. 2d 383, cert. den. 303 U. S. 644, 82 L. Ed. 1103, 58 S. Ct. 642, reh. den. 303 U. S. 668, 82 L. Ed. 1124, 58 S. Ct. 755.) Courts have been and are particular about the sufficiency and promptness of the filing of such pleas. The general rule is set forth in 22 C. J. S., Criminal Law, § 429, p. 1224, as follows:

" 'A plea in abatement must be presented with the greatest promptness, usually not later than the arraignment, and ordinarily must precede an application for a . . . continuance . . . and if not filed in proper time is regarded as waived.'

"The defendant was arraigned September 19, and a plea of not guilty was entered for him. Thereafter, and on October 17, he filed a motion for continuance and the facts presented in his plea in abatement filed November 17, were known to him at the time he sought the continuance. Under such circumstances the right to plead in abatement was waived. (*State v. Tucker,* 115 Kan. 203, 222 Pac. 96; *State v. Bland,* 120 Kan. 754, 755, 244 Pac. 860; *State v. McCarther,* 196 Kan. 665, 414 P. 2d 59.) See, also, *State v. Pittman,* 199 Kan. 591, 433 P. 2d 550, and *Gray v. State,* 194 Tenn. 234, 250 S. W. 2d 86. . . ." (p. 39.)

Before examining the remainder of defendant's specifications, we shall review in some detail the evidence presented at trial.

The offense of which defendant was convicted was alleged in Count 11 of the information in substantially the following language: That on or about the 29th day of October 1965, in Sedgwick county, Kansas, William H. Addington did unlawfully, feloniously, wilfully, with intent to defraud, make false entries in a book of accounts kept by a moneyed corporation within this state, namely, Addington Grain Company, Inc., a Kansas corporation, delivered and intended to be delivered to persons dealing with such corporation by which pecuniary obligations, claims and credits did purport to be created, increased, diminished, discharged, and affected, and did submit a report to the registrar appointed by the chief grain inspector, to wit: A report showing that collateral receipts for 420,000 bushels of wheat had been canceled on October 29, 1965, knowing that such cancelation had not taken place.

The allegations of the information stated a public offense in violation of K. S. A. 21-618.

In the early part of May 1965, defendant paid off loans previously obtained by the Addington Grain Company, Inc. from the Denver United States National Bank by giving two checks, one in the sum of $266,409.82 and the other in the sum of $408,529.38, thereby redeeming warehouse receipts which had been pledged as collateral for the loans. The checks were not honored upon presentation. Thereafter defendant made good the $266,409.82 check with another check. He also negotiated a loan for $500,000 from the bank, pledging four warehouse receipts on Addington Grain Company, Inc., each for 105,000 bushels of wheat, to secure the loan. These official receipts (numbered 12873, 12874, 12875 and 12876) were issued May 17, 1965. $408,529.38 of the loan proceeds was used to pay off the second insufficient funds check.

The ledger books of the Addington Grain Company, Inc., which were kept at that time in Topeka, showed receipt by the company of 300,000 bushels of company-owned wheat on May 17, 1965. Source records later disclosed this to be false. The regular report to the registrar of the company showed an addition to company-owned wheat of 300,000 bushels on that date, as well as the issuance of the four warehouse receipts.

The company's office in Topeka was closed in the first part of October 1965, and the books were moved to Wichita. According to Monty Frazier, defendant's office manager, these books were not kept up after that time, and the company ceased to maintain

a daily position record. In October, the Wichita office took over the task of preparing and filing regular reports to the registrar. Copies of these reports were retained in the Wichita office and used by the company to determine its daily grain position.

On October 29, 1965, Frazier, knowing of the four warehouse receipts pledged to the Denver bank, called defendant in Nevada and advised him that the company's warehouse at Hutchinson was about to be examined. On November 8, S. J. Reda, in company with two other state examiners, began measuring wheat in the Hutchinson facility. They went to defendant's office in Wichita on November 9 to complete their computations and check the office records. The examiners were furnished copies of the company's regular reports to the registrar. These reports were required to be made up each time warehouse receipts were issued or canceled, and not less than once a week. The report form carries a certification that warehouse receipts outstanding and uncanceled do not exceed the amount of grain in the warehouse, and that the report covers all warehouse transactions in regard to grain received or loaded out since the last report. After comparing the "measured" bushels with the book figures shown on the registrar reports, Reda found a shortage of approximately 419,000 bushels and advised defendant of the discrepancy.

The records of the Kansas grain inspection department contained two partially overlapping sets of regular reports to the registrar for the Hutchinson warehouse covering the period October 29 through November 9—one set signed by Frazier and the other signed by defendant. A report dated October 29, and signed by Frazier, showed as outstanding the four collateral warehouse receipts for 420,000 bushels. Another report for the same day, and signed by defendant, showed the four receipts *canceled*. Although no receipts were shown as issued or canceled, and a report was not required, nevertheless reports signed by defendant were filed for October 30, November 1, November 2, and November 3— each time decreasing the amount of company-owned wheat. No reports for those dates were filed or signed by Frazier. Separate reports were again filed for November 4—the one signed by Frazier showing the four collateral receipts outstanding, the one signed by defendant did not mention the receipts. The other reports made by defendant and/or Frazier during the period are immaterial.

On November 8, 1965, defendant went to the Denver bank and

personally obtained the four warehouse receipts he had previously pledged. According to the records of the registrar, the Merchants National Bank in Topeka, these receipts were canceled the next day. (The record is not clear, but presumably the receipts would have been accompanied by a regular report to the registrar.) That same date (November 9) defendant was in his Wichita office while the warehouse examiners were going through the company's records, including the canceled warehouse receipts. During the course of the examination Frazier brought them the four canceled receipts and said, "[T]hese should go into the cancelled box of receipts."

John Krumme, an employee of the warehouse service branch of the United States Department of Agriculture, appeared at defendant's office November 30. He found the Kansas examiners working with copies of registrar reports, which was unusual. Upon asking for the daily position reports, he was told defendant was using copies of the registrar reports to determine the company's daily grain position. Eventually he was furnished the ledger book kept in the Topeka office until October 1965, but abandoned it when he found the entries were confusing, and particularly when he found it contained an entry for 300,000 bushels of wheat on May 17 when the source documents did not confirm receipt of that much wheat by the company. Krumme then obtained the warehouse superintendent's book at Hutchinson showing the daily "load and unloads" of grain, and with that record and office copies of the registrar reports, reconstructed a daily grain position beginning May 13. The reconstructed figures disclosed that on May 17, with the issuance of the four warehouse receipts for 420,000 bushels of wheat, defendant's company had a shortage until these receipts were shown as canceled on defendant's report to the registrar on October 29, 1965. When Krumme confronted defendant on December 3 with the fact the warehouse was short during the summer and fall months of 1965, defendant removed the four receipts from his desk drawer and explained the receipts had been registered in advance so that if defendant were out of town, the company could raise money if necessary.

With this evidence in mind, we will examine defendant's contention there was a fatal variance between proof of the offense and the charge contained in Count 11 of the information.

He first complains there was a variation in the date of the offense

as charged in the information, October 29, 1965, and proof of its commission, November 9, 1965. We do not agree.

The copy of the regular report to the registrar dated October 29, 1965, and signed by the defendant, showed cancelation of the four warehouse receipts in question, when in fact they were not picked up by defendant until November 8, and shown as canceled on November 9 on the records of the registrar. In other words, the October 29 report with respect to cancelation of warehouse receipts was false and was for the ostensible purpose of misleading the examiners, or any other person dealing with the corporation, about the company's true grain position on and after that date. There was ample evidence from which the jury could infer the report was designed to hide the shortage of wheat in defendant's warehouse. This was accomplished, as shown by the evidence, just as alleged in the information—by defendant submitting a false report to the registrar showing the receipts canceled on October 29. Copies of the registrar report were kept and used by defendant in the regular course of business to determine the company's daily grain position. The offense was committed when a copy of the false report was placed in and became a part of the corporation's records at Wichita, and this could have been done on October 29, or on any day prior to the time it was given to the warehouse examiners.

Contrary to defendant's argument, time is not an indispensable ingredient of the offense defined by K. S. A. 21-618. This being the case, the precise time at which the offense is alleged to have been committed is not material. The general rule is that it is not necessary to prove the offense was committed at the time alleged, but it may be proved to have been committed at any time within the period prescribed by the statute of limitations. Exceptions to this rule are where offenses cannot be committed except on certain days or within certain periods of time, as on Sunday or in the nighttime. (*State v. Reno*, 41 Kan. 674, 21 Pac. 803.) As long as the defendant was not misled by the allegations as to the date—and this record discloses nothing to that effect—the date is unimportant, and a conviction may properly follow upon sufficient proof of the commission of the offense within the provisions of the limitations statute. (*Bruffett v. State*, 205 Kan. 863, 472 P. 2d 206; *State v. Jones*, 204 Kan. 719, 466 P. 2d 283; *State v. McCarthy*, 124 Kan. 20, 257 Pac. 925.)

The complaint is also made there was no proof the offense was

committed in Sedgwick county, the argument being the evidence showed the registrar report in question "was prepared and delivered in Topeka," and there was no evidence tending to prove any act requisite to the consummation of the offense in Sedgwick county.

The information alleged the complete offense in the language of the statute and, in addition, alleged defendant submitted a report to the registrar showing collateral receipts for 420,000 bushels of wheat had been canceled on October 29, 1965, knowing that such cancelation had not taken place. The latter part of the allegation was the basis for the false entry alleged to have been made in the book of accounts of the Addington Grain Company, Inc. It was merely descriptive of the offense itself. There was evidence that defendant submitted, or caused to be submitted, the false report in Topeka, as alleged in the information; but the gravamen of the charged offense was the making of a false entry in the company's book of accounts in Wichita, which was established by evidence that a copy of the false report signed by defendant was kept and maintained by him as part of the company's records in the Wichita office. There is nothing in the record indicating that defendant was misled by the charge he was expected to meet.

Ordinarily the place where the offense occurred is a question of fact, just as any other question, to be determined by the jury. Among the instructions given to the jury was one stating it was incumbent upon the prosecution to prove beyond a reasonable doubt that the crime alleged was committed in Sedgwick county. By its verdict the jury found the offense was committed in that county. In *State v. Joseph Little*, 201 Kan. 101, 439 P. 2d 383, we said:

"Venue may be established by proof of facts and circumstances introduced in evidence from which venue may be fairly and reasonably inferred." (Syl. ¶ 2.)

The testimony of defendant's private secretary, upon which he relies as showing the report was actually prepared in Topeka, is vague and inconclusive. Whether the report was prepared in Wichita or Topeka is of minor signficance. The unlawful element of the offense was defendant's placing, or causing to be placed, a copy of the false report in the records of the corporation in Wichita for the purpose of its being used as part of the company's records.

Venue for prosecution of the crime properly lay in Sedgwick county. (K. S. A. 62-404; *Addington v. State,* supra.) For that matter, there was ample evidence that for the period in question reports to the registrar were regularly prepared in the Wichita office, where the copy of the October 29 report, signed by defendant, was found. Under the same rationale applied in forgery cases, a presumption would be warranted that the false report and copy thereof was prepared, or caused to be prepared, in Sedgwick county. (*State v. Joseph Little,* supra; *State v. Johnson,* 189 Kan. 571, 370 P. 2d 107.)

We are satisfied from the over-all record that there was substantial, competent evidence to support the jury's finding that the offense was committed in Sedgwick county.

Defendant's further contention, that copies of registrar reports are not a "book of accounts kept by a moneyed corporation" and information contained in such a report does not constitute an "entry" within the contemplation of K. S. A. 21-618, cannot be sustained.

A public warehouseman is required by statute to file a report to the registrar showing "such information regarding receipts issued or canceled or shipments of grain received or delivered, as may be necessary to enable the registrar to keep a full and complete record of all transactions by said warehouse." (K. S. A. 34-249.) The report form shows that the warehouseman is to report each time there is any change in warehouse receipts, and the particular period of time covered by the report. The form provides for a statement as to the total amount of a commodity in the warehouse at the beginning of the period, the amount received, the amount shipped out, and the balance on hand at the end of the period. Also provided for is a statement as to how much of the balance is owned by the warehouseman and how much is owned by depositors. The form further requires a statement of warehouse receipts outstanding at the beginning of the period, receipts issued and canceled, and receipts outstanding at the end of the period. Each receipt issued or canceled must be specifically listed on the form. Basically, the report contains the same information, although in summary form, as a standard daily grain position record commonly used in the industry. The report serves the purpose of a statement of account of a public warehouseman, and in this case was being used as such. According to Frazier, office copies of the regular report to the

registrar had been used by the company as its daily grain position records since the middle of October 1965. In view of all the evidence, we are of the opinion the district court properly instructed the jury, as a matter of law, that copies of the regular reports to the registrar were to be considered as a book of accounts of the corporation.

In *State v. Kennedy*, 105 Kan. 347, 184 Pac. 734, this court held that a passbook issued by a bank to a depositor was a "book of accounts" kept by the depositor within the meaning of what is now K. S. A. 21-618. The reasoning of that decision is not particularly helpful when applied to the facts here.

Many cases which speak of "books of account" have involved the admissibility of evidence under the "shop book" exception to the hearsay rule. (See, K. S. A. 60-460 [*m*], which is our present law.) Long ago in *State v. Stephenson*, 69 Kan. 405, 76 Pac. 905, this court stated:

". . . It is not necessary to admissability in evidence that a book of accounts be kept in any particular form, nor is it material by what name it may be called; it is enough, if it be a book regularly and correctly kept, containing original entries of the daily transactions of the business, made at or about the times the transactions were had. . . ." (p. 408.)

A similar statement is found in *Nicola v. United States*, 72 F. 2d 780:

". . . Books of account consist of entries made in the regular course of business showing the transactions which have actually occurred in the business. . . ." (p. 783.)

Also, see, *Cudahy Packing Co. v. United States*, 15 F. 2d 133; 30 Am. Jur. 2d, Evidence, §§ 936, 944 and 945; 32 C. J. S., Evidence § 685 (1).

Our research discloses that several other states, notably Missouri, New York, Oklahoma, and Texas, have enacted statutes similar to K. S. A. 21-618.

The Texas statute (Vernon's Ann. P. C., art. 1123) differs from ours in that it is not limited to "moneyed corporations." In *Sims v. State*, 169 Tex. C. R. 466, 334 S. W. 2d 818, a county clerk was charged with making a false entry in a book kept in the course of business of the office of county clerk. Entries in the book reflected the fee charged and collected for filing and recording instruments in his office—the record being designated as "daily report sheets." The evidence disclosed these sheets were placed in loose leaf binders until the end of the year, when they were checked by the auditor, returned to the clerk's office, and were then sent out to

be bound as permanent records. The "daily report sheets" were the only records kept as to monies received for the recording of instruments. The court held the entries made on these sheets were made in a book kept as a book of accounts as defined by the statute.

Likewise, in *Vahlberg v. State,* 96 Okla. Cr. 102, 249 P. 2d 736, under a statute similar to K. S. A. 21-618, except that it pertained to "book of accounts" kept in the office of any county treasurer, the criminal court of appeals upheld an instruction to the jury which stated in effect that the record books referred to as the "work record" and the "permanent tax sales record" are "books of account" kept in the office of the county treasurer of Oklahoma county within the meaning of the statute. Also, see, *State v. Morro,* 313 Mo. 114, 280 S. W. 697, which was decided under an identical statute to ours and involved false entries in a book of accounts kept by a bank "some pages of which were designated 'Certificate of Deposit Register'."

Whether or not copies of the regular reports to the registrar were a book of accounts kept by a moneyed corporation was a legal question to be decided by the court and not, as defendant suggests, a question of fact for determination by the jury. As a general rule, the interpretation or construction and the meaning and legal effect of written instruments are matters of law exclusively for the court. (*Vahlberg v. State,* supra; see, *State v. Kennedy,* supra.) The trial court was required to instruct the jury on all matters of law necessary for its information on giving a verdict ( K. S. A. 62-1447), and no error occurred as a result of the court's refusal to submit the question to the jury.

The assertion is also made that the trial court failed to give certain instructions requested by the defendant. Only one deserves mention. The requested instruction was that to constitute a violation of K. S. A. 21-618 the false entry must, in some manner, affect the pecuniary obligation of the corporation. The court properly denied the request and instructed the jury substantially in the words of the statute. The statute condemns any false entry in a book of accounts by which any pecuniary obligation, claim or credit shall be or shall *purport* to be created, increased, diminished or discharged, or in any manner affected. A like contention was considered and rejected in *State v. Kennedy,* supra, where the alteration was a change of the dates of deposit in a passbook. There it was stated:

"Where an employee whose duty it is to collect the cash of a moneyed corporation and deposit it in the bank, falsely and with intent to cover up his defalcation, alters the date of an original entry in the pass book so as to prevent the officers or other employees of the corporation from discovering the true state of the account, the alteration constitutes forgery within the provisions of the statue referred to, notwithstanding the actual amount of money to the credit of the corporation remains the same after the alteration as before." (Syl. ¶ 3.)

(Also, see, *State v. Morro,* supra.)

Most of defendant's other contentions concerning requested instructions not given, and the inadequacy of the court's instructions in general, have been inferrentially answered in the discussion of earlier specifications. Keeping in mind that the adequacy of instructions is determined by their being considered as a whole, each in conjunction with all other instructions in the case (*State v. Trotter,* 203 Kan. 31, 453 P. 2d 93), we are satisfied the court fully and correctly instructed the jury as to all material questions of law involved in the case.

Finally, we cannot subscribe to defendant's argument that the jury was coerced into rendering a verdict. Trial of the case covered six weeks and involved twenty-five days of trial time. The case was submitted May 6. The next day the jury advised the court it was deadlocked and needed further instructions. During the ensuing four days the court gave several additional instructions in response to specific questions tendered by the jury. On May 10 the jury reported it was unable to agree on Counts 1 through 10 but it had arrived at a verdict on Count 11. The length of time a jury should be kept deliberating in an attempt to reach a verdict is a matter resting within the sound discretion of the trial judge. (*Taylor v. Holyfield,* 104 Kan. 587, 180 Pac. 208; *Brecheisen v. Clark,* 103 Kan. 662, 176 Pac. 137.) Under all the circumstances, we discern no abuse of discretion on the part of the lower court in keeping the jury at its task after the court was informed of the deadlock and the need for additional instructions.

After carefully examining the entire record, we have concluded that no prejudicial error warranting reversal has been made to appear.

The judgment is affirmed.