No. 46,049

STATE OF KANSAS, *Appellee,* v. TOM LEE THEUS, *Appellant.*

(485 P. 2d 1327)

Opinion filed June 12, 1971.

*Robert M. Brown,* of Topeka, argued the cause and was on the brief for the appellant.

*Gene M. Olander,* county attorney, argued the cause, and *Vern Miller,* attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

FOTH, C.: Appellant was convicted by a jury of first degree murder and sentenced to life imprisonment in accordance with the jury's verdict. He appeals from the judgment of conviction and

sentence, and from the court's order overruling his motion for a new trial, both entered March 11, 1970.

One of appellant's contentions here, as in the trial court, goes to the weight of the evidence. He claims that the state's evidence was insufficient to go to the jury, and his motion for discharge at the close of the state's case should therefore have been sustained. As a corollary, he urges that the verdict was contrary to the evidence.

This contention requires that we review briefly the state's case. In so doing, we bear in mind the well established propositions that it is the function of the jury, not of an appellate court, to weigh the evidence and pass upon the credibility of witnesses; and a verdict based on substantial competent evidence will not be disturbed on appellate review. *State v. Lyon*, 203 Kan. 78, 452 P. 2d 838; *State v. Wade*, 203 Kan. 811, 457 P. 2d 158, and cases cited therein.

Testimony adduced by the state indicates that on the fatal night, October 3, 1969, at about 8:30 p. m. the deceased, Gladys Freeman, arrived in the company of two female friends at an establishment known as the Thirteenth Street Tavern, located on the southeast corner of Thirteenth and Monroe streets in Topeka.

There are conflicts in the testimony concerning the many turbulent events of the evening, all of which need not be detailed here. The two friends who had accompanied the deceased to the tavern and her daughter who arrived later variously testified that on more than one occasion the appellant quarreled violently with the deceased; that he accused her of having $150 belonging to him; that he threatened to kill her if she didn't pay him the money forthwith; that he slapped her about the head and shoulders; that he waved a pistol in front of the tavern in a threatening manner; that he called her "bitch" and repeated his threats to kill her on several occasions, the last time shortly before the fatal shot was fired.

Two bystanders, Mr. and Mrs. Roland Gray, arrived on the scene around 10:45 to 11:15 p. m., shortly before the shooting. They parked their car at the northeast corner of Thirteenth and Monroe, just north of the tavern. They each testified to an encounter between appellant and the deceased in front of the tavern in which appellant shook her and said something about $150; that she went back into the tavern and he shortly thereafter followed her; that they came out together and he told her to get into his car, a 1963

Cadillac which was parked in front of the tavern; that she did so, sitting in the passenger's seat; that appellant went back into the tavern for a few minutes and then returned to the driver's side of the car; that he shortly thereafter took something out of his pocket, extended his arm into the car, and a shot was fired.

Shortly before the shot there appeared on the scene one Billy Stevenson, also known as William McKinley Miller, Jr. He was observed by the Grays talking to the deceased while she was sitting in the car and appellant was in the tavern. Immediately after the shot he and appellant entered the car and drove away. The Grays followed to the hospital.

Stevenson, testifying for the state, said he was present at the time the shot was fired but did not see it fired or see appellant with a gun; he had been talking to deceased while she was sitting in the car but turned and started to walk away when appellant approached; and that he heard the shot. He denied having a pistol in his possession at any time during the evening. More will be said of this aspect of his testimony later.

The deputy coroner testified that deceased died as a result of a bullet wound to the head. The bullet entered half way between the root of the nose and the left eye and traveled toward the right side of the head in an upward and backward direction. (We note that this is consistent with relative positions of appellant and the deceased at the time of the shot, as related by the Grays.) From his examination he concluded the gun had been fired at fairly close range. The bullet was identified by a police expert as being from a .22 caliber gun.

From the foregoing abbreviated version of the state's evidence it is clear that there was ample testimony which, if believed by the jury, would warrant its verdict. The court below therefore did not err in overruling appellant's motion for discharge or in finding on his motion for new trial that the evidence was sufficient.

Prior to the voir dire appellant challenged the array of jurors and alleges that the trial court erred in overruling his challenge. The basis of his attack is that the panel was selected by the judges of the district court from the Shawnee County voter registration lists, and not from the assessment rolls as he contends they should have been under K. S. A. 43-102. The answer to this contention requires a review of the legislative history of the methods of selecting jurors in this state.

G. S. 1868, ch. 54, § 1, assigned the duty of selecting prospective

jurors in every county to the county commissioners, who under § 2 were to employ the assessment roll of the previous year. This duty was transferred to the township trustees and the mayors of most incorporated cities by Laws 1876, ch. 104, § 1. The 1876 amendment has come down to us unchanged and now appears as K. S. A. 43-101. The 1868 direction that those officers use the assessment rolls of the preceding year as their source is now incorporated in K. S. A. 43-102.

However, in 1907 the legislature introduced a wholly new statutory method of selecting prospective jurors in counties having a population of over 100,000 (Laws 1907, ch. 232). This act now appears basically as K. S. A. 43-135 (as amended) through 43-147. The applicability of this act was amended to cover counties over 90,000 by Laws 1921, ch. 167, § 1, and again to those over 80,000 by Laws of 1953, ch. 242, § 1. (Certain additional counties between 40,000 and 80,000 were brought under the act by Laws 1967, ch. 278, § 1, but they do not concern us here.)

The salient feature of the 1907 act applicable to the larger counties appeared in § 2, and now appears as K. S. A. 43-136:

"In every county in this state to which this act may apply, the judges of the district court and such other courts of general jurisdiction if any in said county, as soon as practicable after the passage of this act, shall meet and cause to be made under their supervision a complete list as near as they can, alphabetically arranged, of all the qualified jurors in the county and their residences; said lists shall be revised by said judges at least once each year, and as much oftener as said judges shall deem necessary, and all names of qualified jurors in said county, as far as can be ascertained by said judges, shall be added thereto, and the names of those persons who have died, removed from the county or otherwise become disqualified shall be stricken therefrom. The names so stricken therefrom, when drawn from the wheel or box as hereinafter provided, shall not be certified to the clerk of the court requiring the jury, but another name in lieu thereof shall be drawn and the card bearing said name shall be destroyed. In compiling and revising said lists, said judges and their clerks and assistants may have access to the books of the county clerk, county treasurer, *and such other records of the county as they may desire.*" (Emphasis supplied.)

It will be noted that this section speaks only of "qualified jurors," with no limitation on the sources from which their names must be derived. Were that source to be only the assessment roll, access to the books of the county clerk and treasurer would be sufficient, and access to "such other records of the county as they may desire" would be superfluous. In Shawnee County voter registration lists are maintained by the county election commissioner, and are "records of the county."

The distinction between the methods of selecting juries in the smaller as opposed to the larger counties was recognized in *State v. Millhaubt*, 144 Kan. 574, 61 P. 2d 1356. Although that case involved a challenge to a grand jury rather than a petit jury, the court had occasion to observe:

"Sedgwick county has over 100,000 population, hence is governed by R. S. 43-135 to R. S. 43-150, inclusive, the provisions of which refer solely to petit jurors. Under the last-mentioned statutes, a different method of making up the jury list obtains (compare R. S. 43-101 to 43-106, inclusive, with R. S. 43-136), . . ." (p. 577)

To round out our discussion we also note that the same session which lowered the applicability of 43-135 through 43-147 to 80,000 also created a whole new method of selecting prospective jurors in counties over 225,000 (Laws 1953, ch. 241). The assessment rolls were reintroduced, and this feature was retained when that act was replaced by Laws 1955, ch. 249, now appearing as K. S. A. 43-154.

We thus have three separate and distinct methods of selecting prospective jurors: one, applicable to most counties under 80,000, governed by K. S. A. 43-101 through 43-134; the second, applicable to counties from 80,000 to 225,000 and certain counties from 40,000 to 80,000, governed by 43-135 through 43-147; and the third, applicable to counties over 225,000 governed by 43-154. Under the first and third methods the statutes specifically provide that the basic source of names is to be the tax assessment rolls. Under the second, applicable here, the judges of the district court may use such sources "as they may desire."

Further, we have held as a general principle that a jury panel is not to be quashed on any ground which does not involve corruption, serious misconduct or palpable disregard of the law. (*State v. Stanphill*, 206 Kan. 612, Syl. ¶ 3, 481 P. 2d 998, and cases cited therein.) None of those elements is present here, and there is no showing that any juror who sat was not qualified. The trial court therefore did not err in overruling appellant's challenge to the array.

Appellant next urges as error the trial court's ruling sustaining a challenge for cause of one prospective juror, Donald J. Green, and its general conduct with respect to him. His contention is grounded on *Witherspoon v. Illinois*, 391 U. S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, which held that the death penalty could not constitutionally be imposed by a jury from which all persons with conscientious scruples against capital punishment had been excluded.

The case offers no support for appellant's position for two reasons. First, the death penalty was not imposed here. In *Witherspoon* it was only the death penalty that was stricken down; the finding of guilty by what the court called a "hanging jury" was allowed to stand. Second, the scruples of the prospective juror in question here went far beyond a reluctance to impose the death penalty; he testified that they would affect his ability to render an impartial verdict on the issue of guilt. This brought him squarely within the ambit of former K. S. A. 62-1404, which provided:

"If the offense charged be punishable with death, any person entertaining such conscientious opinions as would preclude his finding the defendant guilty shall not serve as a juror."

We believe this standard wholly consonant with the constitutional principle announced in *Witherspoon.*

Because appellant complains that the trial court led the prospective juror into his disqualifying testimony we deem it appropriate to excerpt the pertinent portion of the trial court's inquiry made after the juror's opposition to capital punishment was elicited:

"THE COURT: Well, I think the Court will ask the juror several questions. First of all, the question is not whether you have scruples against the death penalty—a sizeable percentage of our population has such scruples, and there's nothing wrong with having those scruples. I want you to understand that. However, jurors should follow the Court's instructions as to the law. Those instructions will state in sum and substance among other things that in the event, and only in the event, the defendant were determined to be guilty, the jury should then exercise its prerogative and its discretion to determine what the penalty should be. Now, if the Court instructs you that this is the law and that this is your duty to enter into this determination, will you do that and will you subject any scruples that you may have to at least the Court's instructions and follow the instructions so that you could exercise this discretion?

"DONALD J. GREEN: I would try.

"THE COURT: You would try? Well, I think that is all we can ask any juror to do. You understand that you have the duty, under the Court's instructions, to follow the law. Now, the Court does not tell the jury how to make the decision, that is, what the decision should be. The Court tells the jury how the jury should exercise its function as the trier of the fact, and the Court instructs the jury on the elements of the offense and all the other pertinent matters which the jury should know about so that they are fully instructed in undertaking the function of reaching a verdict. I think you have indicated that you would try to follow the Court's instructions honestly and conscientiously, is that correct? You understand I am not asking you to say that you don't have any scruples; I am simply asking whether you could follow the Court's instructions.

"DONALD J. GREEN: Sir, I am against taking a man's life. That's all there is to it, and I don't feel that I am a worthy one to be here feeling this way.

"The Court: Would that affect your ability to determine his guilt?
"Donald J. Green: Yes, sir.
"The Court: You don't believe that you could fairly determine his guilt?
"Donald J. Green: Yes, sir.
"The Court: All right, I will sustain the challenge for cause under Kansas Statutes Annotated 62-1404."

In pursuing this line of questioning we think the trial court was not only acting within the bounds of its discretion but of its duty. Once the issue was raised, we believe it to have been the court's duty to determine whether, despite his scruples, the juror could render an impartial verdict. This, we believe, is inherent in *Witherspoon* and our statute. Read as a whole the trial court's comments and questions indicate a readiness to retain the juror to the very point where he repeatedly stated that his scruples were such that despite the court's instructions he could not fairly determine the issue of guilt. We find no error in the trial court's conduct with respect to this juror.

Appellant had employed a private detective to investigate the case, interview witnesses and make reports to his attorney. Prior to trial appellant moved the court to exclude from the courtroom all witnesses until they should be called to testify, and his motion was sustained. Appellant then asked that an exception be made for his investigator. Upon informed that the investigator would be a witness, the court refused to make such an exception, and appellant claims this was error.

Generally speaking, the question of whether to exclude witnesses or not, and what exceptions may be made, is discretionary with the trial court in the absence of a showing of prejudice. See *State v. Guffey*, 205 Kan. 9, 15-16, 468 P. 2d 254 and authorities cited therein. Appellant points to no prejudice resulting from the court's ruling, and none appears from the record. We cannot, therefore, find an abuse of the court's discretion.

Appellant further contends that the court had no jurisdiction over his person because he was arrested on a warrant unlawfully issued by the magistrate court. The unlawfulness, he alleges, stems from the fact that the complaint upon which the warrant was issued was not formally sworn to nor was testimony received by the magistrate.

The chief difficulty with this contention is that it was never made by appellant until he filed his motion for a new trial. In the meantime he had participated with counsel in a full preliminary hearing,

been bound over for trial, pleaded to the information filed against him, announced himself ready for trial, participated fully in the trial, and had been found guilty by a jury. At this point it is much too late to complain about any irregularity in the issuance of the original warrant. See *State v. Addington*, 205 Kan. 640, 643, 472 P. 2d 225. Further, unlawfulness of an arrest does not alone vitiate a subsequent conviction or deprive a court of jurisdiction to try an accused. *State v. Addington, supra,* and authorities cited therein; Hatcher's Kansas Digest, Perm. Supp. Vols. 1-3, Criminal Law §22.

Appellant's reliance on *Giordenello v. United States*, 357 U. S. 480, 2 L. Ed. 2d 1503, 78 S. Ct. 1245, is wholly misplaced. There evidence seized as an incident to the arrest was admitted at trial. When the warrant on which the accused was arrested fell under a Fourth Amendment attack, the evidence and the conviction based thereon fell with it. Here, no evidence was seized at the time of appellant's arrest, and no other prejudice of any kind is shown. *Giordenello* is simply not in point.

Finally, appellant urges that he should have a new trial because one of the state's witnesses confessed to perjuring himself on the witness stand. This witness was Billy Stevenson, also known as William McKinley Miller, Jr., whose trial testimony referred to was basically that he did not see but only heard the fatal shot, and that he did not have a pistol in his possession on the fatal night. He had previously given statements to the same effect to the county attorney and to appellant's investigator.

His repudiation of this testimony must be viewed in the light of the testimony given at the trial by appellant, who had taken the stand in his own behalf. Appellant's version of the shooting was that while he was standing near the car in which the deceased was sitting Stevenson approached him with a pistol in his hand. Stevenson, according to appellant, was interested in buying the gun but it had some sort of malfunction. Appellant testified that he asked the deceased to hand him a screwdriver from the glove compartment, which she did; that he inserted it behind the trigger of the pistol, which then discharged accidentally; that he paid no attention to where it was pointed; that he then handed the gun back to Stevenson and went into the tavern to get a beer for the deceased; and that it was only when he came out of the tavern three or four minutes later that appellant first observed that the deceased had been shot. The jury obviously disbelieved this story, as was their right.

The day following the verdict Stevenson, at this time residing in the county jail, became suddenly conscience-stricken. He called the undersheriff and confessed that he had lied at the trial; that he had in fact brought a pistol to appellant to examine and repair; and that it discharged accidentally as appellant had said it had. He apparently then made a similar statement to appellant's investigator.

At the hearing on appellant's motion for a new trial he gave substantially the same recanting testimony. In findings of fact filed the next day the trial court expressly found that Stevenson's new testimony ". . . is untrustworthy and unreliable and is, therefore, entitled to no weight or credit." The same finding was made as to Steven's post-trial statements as to the undersheriff and appellant's investigator.

The trial court, in a memorandum opinion, elaborated on these findings:

"There are many reasons why the Court found that Stevenson's latest testimony was unreliable and entitled to no weight or credit. First, his demeanor and appearance at the post trial hearing was such as to cause the Court to discredit his testimony. Second, it seems improbable that Stevenson's original statement given to the County Attorney would be any less accurate than Stevenson's version of the facts after the jury found the defendant guilty. Such statement was much earlier in time and there was no logical reason for Stevenson to lie about knowledge of the facts at that early stage. Stevenson was unconvincing when he stated that he was afraid that if he told the truth he would somehow become implicated in a crime. Just how this could have happened is unclear to the Court. The fact that Stevenson gave defendant's investigator a statement similar to that given to Mr. Olander and to Stevenson's testimony at the trial is difficult to square with Stevenson's post trial explanation of his change in story. There seems to be no compelling reason for not telling said investigator the truth before trial. Furthermore, since the statement given to the County Attorney was not under oath, Stevenson could not have been guilty of perjury in making said statement. Thus, it would have been most illogical for Stevenson to have concluded that he had to testify at the trial in a manner consistent with the unsworn statements given before trial. Quite the contrary, Stevenson would have committed perjury by testifying in accordance with said unsworn statements, if in fact they were untrue.

"Another consideration is that it seems implausible that when called to testify in a first degree murder case Stevenson did not realize the gravity of the situation and the importance of telling the truth until after the jury returned its verdict of guilty. As soon as the verdict was in, Stevenson just happened to start thinking and only then decided to tell the 'truth'. And, of course, the 'truth' just happened to correspond to defendant's own version of the facts. Such a state of affairs can hardly be expected to enhance Stevenson's credibility.

"An additional consideration is that Stevenson and the defendant were inmates of the Shawnee County Jail, both before and after the trial. Furthermore,

it is reasonable to assume from the evidence of the trial that they have been acquainted for some time and are not on unfriendly terms.

"For all of the foregoing reasons the Court as the trier of the facts with respect to the evidence presented by defendant in support of his motion for new trial, totally discounted Stevenson's testimony."

We believe the trial court was fully justified in its findings and in disregarding this ground for the motion for a new trial. In *State v. Buton,* 124 Kan. 509, 260 Pac. 634, the trial court had refused a new trial despite a recanting affidavit of a material prosecution witness, refuted by other affidavits offered by the state. The court said:

"In this situation appellant contends that it is the function of the jury to weigh the testimony, and that there was nothing for the court to do but to grant a new trial. This contention cannot be sustained. The court, not the jury, passes on the motion for a new trial, and any evidence offered in support of it. Obviously, a court is not compelled to give credence to false testimony offered in support of a motion for a new trial. One who recants his sworn testimony in court necessarily raises a serious question as to his own veracity. In 16 C. J. 1188, the rule is thus stated:

"'But recantation by witnesses called on behalf of the prosecution does not necessarily entitle defendant to a new trial. The question whether a new trial shall be granted on this ground depends on all the circumstances of the case, including the testimony of the witnesses submitted on the motion for the new trial. Moreover, recanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true. Especially is this true where the recantation involves a confession of perjury.'" (pp. 509-510.)

See also *State v. Birzer,* 126 Kan. 414, 268 Pac. 842; *State v. Smith,* 126 Kan. 670, 271 Pac. 289.

We find no error and the judgment is affirmed.

APPROVED BY THE COURT.